IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DANIEL SCOTT WEED,                          :

      Petitioner,                          :

vs.                                                     CA 05-00022-BH-C

                            :

TERRANCE MCDONNELL,

                            :

      Respondent.

## REPORT AND RECOMMENDATION

Daniel Scott Weed, a state prisoner presently in the custody of the respondent, has petitioned this Court for federal habeas corpus relief pursuant to 28 U.S.C. § 2254.  Petitioner is challenging the validity of his June 12, 2001 first-degree robbery and first-degree sodomy convictions in the Circuit Court of Mobile County, Alabama.  Weed entered counseled guilty pleas to the charges and was sentenced to concurrent terms of life imprisonment.  Weed directly appealed his convictions and sentences; however, both convictions and sentences were upheld on appeal by unpublished memorandum opinion. *See Weed v. State*, 851 So.2d 639 (Ala.Crim.App. 2001) (table).  Petitioner also collaterally attacked his convictions and sentences via a Rule 32 petition filed in the Circuit Court of Mobile  County, Alabama on December 24, 2002.  The petition was denied by the trial court in orders dated January 14, 2003, April 16,

2003, and March 18, 2004. The Alabama Court of Criminal Appeals affirmed the denial of the petition by memorandum opinion dated August 27, 2004. Weed's application for rehearing was denied by the Alabama Court of Criminal Appeals on September 17, 2004, and his petition for writ of certiorari to the Alabama Supreme Court was denied on January 7, 2005.

In his petition before this Court, filed on January 11, 2005 (Doc. 1), Weed raises the following grounds which he claims entitle him to relief:

(1) the trial court committed reversible error by dismissing his *Brady v. Maryland*[1] violation claim based on the "open file" discovery rule without allowing any discovery or presentation of facts in support of the claim;

(2) the trial court committed reversible error by denying his due process and equal protection violations based on the failure to allow him sufficient funds for interpreters to assure him, as a deaf mute, to the same process and protection of the laws afforded non-deaf persons;

(3) the trial court committed reversible error by denying his right to know the evidence, to have sufficient time to evaluate the evidence, to have sufficient funds for interpreters, and by effectively upholding the State's withholding of exculpatory DNA evidence;

---

[1] 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

(4)     the trial court committed reversible error in denying his claims of ineffective assistance of trial counsel;[2] and

(5)     the trial court committed reversible error by denying his claims of ineffective assistance of appellate counsel.[3]

Respondent admits that petitioner has presented all of these claims to the state courts of Alabama and that they are therefore exhausted for federal habeas corpus purposes.  Therefore, this case is ripe for a decision by this Court.   Respondent does contend, however, that this Court is procedurally barred from reaching the merits of grounds one through three of the petition and

---

[2]     Petitioner contends that trial counsel provided ineffective assistance in the following instances: (1) he failed to reserve the right to appeal the recusal issue; (2) he waived petitioner's right to a bifurcated trial on the competency issue and to petitioner's presence at the recusal hearing; (3) he did not sufficiently confer with petitioner prior to trial because he at no time met with petitioner to discuss the case when an interpreter was present; (4) he allowed petitioner to plead guilty to a sexual offense even though the DNA evidence indicated petitioner could not have committed the crime; (5) he did not object to or reserve for appeal petitioner's right to have his criminal prosecutions assigned to a judge by the usual lottery system; (6) he failed to confer with petitioner at a location away from the courthouse and did not reserve this issue on appeal; (7) he failed to request the services of interpreters in a timely manner; and (8) he did not challenge the constitutionality of Alabama law regarding the appointment of interpreters for deaf mutes in criminal prosecutions and/or its failure to satisfy constitutional standards.

[3]     Petitioner contends that appellate counsel provided ineffective assistance in the following instances: (1) he failed to raise trial counsel's effectiveness on appeal; (2) he failed to raise the *Brady* violation on appeal; (3) he failed to raise on appeal the issue of a due process and equal protection violation; (4) he failed to raise the issue regarding petitioner's right to assist in his defense, to know the evidence, and to have sufficient time to evaluate the evidence as a result of being denied sufficient funds for interpreters and the withholding of exculpatory evidence; and (5) he failed to raise on appeal the issue of the unconstitutionality of Alabama law regarding the appointment of interpreters to deaf mutes in criminal prosecution and/or its failure to satisfy constitutional standards.

that petitioner has not shown himself entitled to relief under 28 U.S.C. § 2254(d)(1) & (2) with respect to his claims of ineffective assistance of trial and appellate counsel.

This cause is before the Court on the petition and memorandum in support thereof, respondent's answer with attachments, petitioner's response to the Court's March 10, 2005 procedural default order, respondent's response to the Court's March 10, 2005 order, and the respondent's response to the Court's May 19, 2005 order.   The Magistrate Judge has made a careful review of the record and finds that it contains sufficient facts upon which the issues under consideration may be properly resolved.   Therefore, no evidentiary hearing is required.

## **FINDINGS OF FACT**

1.      On September 29, 2000, Dr. LeRoy Riddick, Mobile County's Deputy Medical Examiner, mailed his department's forensics report to Corporal J. Dannelley with the Mobile Police Department and also copied John Tyson, Jr., Esquire with the report. (Doc. 9, Respondent's Exhibit 5, September 29, 2000 Letter from Dr. LeRoy Riddick to Corporal J. Dannelley) The laboratory results from August 1, 2000, or thereabouts, reveal the following:

> On July 5, 2000 this laboratory received evidence from James Dannelley of the Mobile Police Department pertaining to the investigation of the above described case. A description of these

items and laboratory results follows:

1. One sealed sexual assault examination kit identified as from the subject, Shannon Snow. The kit contained the following items:

    A. Blood. A stain was made of this item.

    B. Fingernail scrapings[,] known head hair, known pubic hair, pubic hair combings, foreign material. These items were retained with the evidence.

    C. Two oral swabs. No seminal fluid was detected.

    D. Four vaginal swabs. Seminal fluid was detected.

    E. Dried secretions (location unknown). No seminal fluid was detected.

    F. Genital swabbings. Seminal fluid was detected.

    G. One oral smear slide. No spermatozoa were observed.

    H. One vaginal smear slide. Spermatozoa were observed.

2. Clothing identified as from the subject, Shannon Snow. The clothing consisted of a pair of panties, a bra, a shirt, and a pair of shorts. Laboratory examination disclosed the presence of seminal fluid on the panties and shorts. no seminal fluid was detected on the bra or shirt.

The following items were received from Lawrence Jernigan of the Mobile Police on July 6, 2000:

3. One cardboard box sealed with tape identified as containing items recovered from the scene, items recovered from the suspect[']s vehicle and clothing from the suspect identified as recovered at Headquarters. Laboratory examination of a piece of cardboard identified as from the crime scene disclosed the presence of semen. Laboratory examination of a piece of chewing gum identified as from the crime scene failed to disclose the presence of seminal fluid. The remaining items were retained with the evidence.

If DNA comparisons to a suspect are requested, please submit a known blood sample from the subject.

The evidence will be returned to the submitting agency.

(*Id*., August 1, 2000 Letter Penned by Forensic Scientist Faron Brewer)

2.    The October, 2000 session of the Mobile County Grand Jury indicted Weed on one count of first-degree robbery, one count of first-degree sodomy, and one count of attempted rape in the first degree. (Doc. 9, Respondent's Exhibit 1, INDICTMENTS)

3.    On October 31, 2000, Faron Brewer detailed his DNA-PCR testing of certain items in a memorandum. (Doc. 9, Respondent's Exhibit 5, October 31, 2000 Memorandum Penned by Faron Brewer)

The following items were examined by DNA-PCR testing:

1a. Blood sample identified as from Shannon Snow.
1d. Vaginal swab identified as from Shannon Snow.
3a. Semen stain from piece of cardboard identified as recovered from the crime scene.
5.   Blood sample identified as from Daniel S. Weed and received from James Dannelley of the Mobile Police Department on August 10, 2000.
6.   Blood sample identified as from Jason Snow and received from James Dannelley on August 24, 2000.

Results:

The items above were examined using the following systems: CSF1PO, TPOX, AME, TH01, vWA, D16S539, D7S820, D13S317, and D5S818.

These results indicate that Daniel S. Weed could be the source of the DNA contained in item 3a (cardboard).

The probability of a random, unrelated individual having this set of genetic traits is approximately 1 of 167,000,000 caucasian individuals and 1 of 330,000,000 black individuals.

These results further indicate that the source of the DNA contained in item 3a (cardboard) is a male.

The results further indicate that Jason Snow could have contributed the foreign DNA detected on item 1d (vaginal swabs). Daniel S. Webb is excluded as a contributor to the foreign DNA detected on item 1d (vaginal swabs).

The evidence will be returned to the submitting agency.

(*Id*.)

4.      The trial court entered an order on November 14, 2000, directing the State to make available certain documents to the defendant at arraignment, including any and all evidence tending to exculpate his guilt. (Doc. 9, Respondent's Exhibit 1, November 14, 2000 ORDER)

5.      Petitioner was arraigned on all charges on December 12, 2000 (Doc. 9, Respondent's Exhibit 1, CASE ACTION SUMMARY SHEETS)[4] and, on December 29, 2000, he filed a motion for a psychological evaluation based upon his plea of not guilty by reason of mental disease or defect (*id*.; *see also* Doc. 9, Respondent's Exhibit 1, MOTION FOR PSYCHOLOGICAL EVALUATION). The motion was granted and the trial court ordered that an

---

[4]      There is no indication from the record that the foregoing forensic evidence was disclosed to Weed's trial counsel at arraignment.

evaluation be conducted by Dr. Van Rosen. (Doc. 9, Respondent's Exhibit 1, CASE ACTION SUMMARY SHEETS)

6.      On January 24, 2001, Circuit Judge Roderick Stout ordered that Weed's cases be transferred to the docket of Circuit Judge Joseph Johnston. (*Id*.)

7.      Weed was examined by Dr. Van Rosen on March 23, 2001. (Doc. 9, Respondent's Exhibit 5, Rosen's Outpatient Forensic Evaluation Report) Dr. Rosen gave an advisory opinion about petitioner's competency to stand trial and mental state at the time of the alleged offenses in light of his recognition that "the determinations of a defendant's Competency to Stand Trial and Mental State at the Time of an Alleged Offense are properly matters for the court to decide." (*Id*., at 7)

Competency to Stand Trial:

Mr. Weed was interviewed at length regarding his understanding of his charges as well as his general ability to cooperate with his attorney in his forthcoming criminal trial. As an aid in determining the depth of his knowledge, he was administered the Competency to Stand Trial Assessment Instrument. This is a semi-structured interview type protocol used nationally to help determine an individual's knowledge of various areas of criminal procedures deemed necessary to adequately defend himself.

Mr. Weed was quite aware of his charges and appeared to be knowledgeable in general about his situation and his attorney. He was able to describe his charges, the potential penalties if

8

convicted and where he would be imprisoned if sentenced. He was, however, quite reluctant to give estimations of his chances of being convicted or the strength of the state's case. Mr. Weed also provided good explanations of the roles of such courtroom participants as the defense attorney, prosecuting attorney, judge, jury and witnesses for the prosecution. He understood his right to remain silent and was also able to describe relatively accurately the flow of a criminal court case. He showed considerable confidence in his attorney and stated quite explicitly that he would do as he was directed, deferring to his attorney's experience in these matters. He was aware of plea-bargaining and seemed willing to discuss the matter with his attorney, although [he] would not commit to what he would do until he had seen a real offer.

Mr. Weed was initially quite unwilling to discuss any details revolving around his charges, claiming that he had a right to remain silent. When reminded that the purpose of the evaluation was to determine his mental state and emotion condition at the time of the alleged criminal act[s], he then volunteered that he had been high on crack cocaine at the time of the incident.

Based on the overall evaluation, Mr. Weed seems quite capable of cooperating with his attorney in any forthcoming criminal case. [Cooperation with] [h]is attorney and participation in the court procedure w[i]ll, of course, require the use of an interpreter as used in this assessment.

Mental State at Time of the Offense:

As noted above, the defendant was very reluctant to discuss his actions or thoughts during any aspect of the alleged crime[s]. He claimed essentially th[at] his actions have been the result of being under the influence of crack cocaine and then attempted to state that he simply did not remember any aspects of such behaviors. At the same time, however, he also attempted to strongly imply that he was innocent of the charges and thus he essentially was trying to both deny and explain his actions. During his conversation, his explanation of his actions and his confused

9

account of so-called "memory loss" appeared to be quite suspicious. It was noted that Mr. Weed could easily recall certain aspects of his behavior, at the same time stating that he remembered nothing. In this examiner's strong opinion, the defendant is simply making a false claim[] of a lack of memory. In my view, at the time of the alleged crime[s], Mr. Weed was well able to understand the difference between right and wrong and did not suffer from any serious mental disorder rendering him out of touch with reality. It may be that his possible use of substances (e.g., cocaine) contributed to his impulsivity in part, although in general I believe this is a manufactured excuse. Based on this assessment, my forensic opinion is that he does not have a so-called mental state [defense] and requires normal d[i]sposition through the criminal justice system.

(*Id*. at 5-6)

8.      The docket sheets contain entries dated February 21, 2001 setting the case for trial on June 11, 2001 and ordering defense counsel to prepare an order authorizing the interpreter to be paid by the State of Alabama and an order to transport petitioner to the doctor. (Doc. 9, Respondent's Exhibit 1, CASE ACTION SUMMARY SHEETS)

9.      On March 19, 2001, Circuit Judge Johnston signed an order that Weed be transported to the doctor's office on March 20, 2001 for evaluation. (*Id*.) Weed was evaluated by Dr. James F. Chudy, a clinical psychologist, whose conclusions and recommendations are detailed hereinafter:

Scott Weed presents with an extremely painful life to this point. The losses and traumas include deafness for which he blames God, total rejection by his father to the point his father was almost sadistic about it, the death of his grandfather, who was the

10

only significant male in his life, rejection from all relatives, Tourette's Syndrome that led to extreme teasing, rejection by the only institute that could have helped in the important age in his life (Talladega), abuse at the alternative school (The Learning Tree), and finally the misrepresentation by the Regional School where he ended up with a diploma that was of no use.

Throughout all of this, Scott became progressively more despondent and angry as he went into early adolescence and then on to mid-adolescence. He began acting out his anger at times in rageful ways. His mother asked for help from various agencies such as the local mental health agencies and Strickland Youth Center, but did not receive any assistance. After he was charged the first time with possession of burglary tools and public drunkenness there was a very strong and sound plea made for him to be referred to an appropriate treatment center for the deaf in Florida. The deaf very much need to be treated in an environment where they are understood. Their conception of life and their understanding of simple things such as feelings and emotions, are completely different from those of the hearing. Unfortunately, this recommendation was never seriously considered. As a result, Scott has never been provided any type of appropriate, professionally sound psychological treatment. Instead, his life has just progressively become, in his opinion, more out of control and hopeless, with less and less options. If his act is viewed as the act of a serial rapist, it will mean throwing Scott's life away. On the other hand, Scott has never been given a chance to work through the many problems he has. The testing and the other people [] involved in his life on a more regular basis feel strongly that the prognosis would be very good if he were given a chance to be in a treatment facility for the deaf that would provide a Dual Diagnosis treatment. This means that it would certainly treat his substance abuse, but also all of his psychological, emotional and cognitive problems that have resulted from a very difficult past and the serious criminal problems in his present life.

If Scott is sentenced to prison long-term without any form of treatment he definitely needs to be put on suicide watch.

(Doc. 9, Respondent's Exhibit 5, PSYCHOLOGICAL EVALUATION by Dr. James F. Chudy, at 11-12)

10.    On May 29, 2001, Dr. Leroy Riddick, the Legal Custodian of Record for the Alabama Department of Forensic Sciences, sent to the District Attorney's Office the following certification: "I LeRoy Riddick, M.D. Director, hereby certify that the attached document(s) is a true and complete copy of the report(s) of our findings pertaining to the above case which is on file in my custody in the Alabama Department of Forensic Sciences, Mobile, Alabama, and that I am the legal custodian of said report(s). I further certify  that it was in the regular course of business of said Department for such report(s) to be made at the time of the events, transactions or occurrences to which they refer or within a reasonable time thereafter. This includes the other requested information according to your subpoena/court order." (Doc. 9, Respondent's Exhibit 5, Defendant's Exhibit 3 to September 3, 2003 Rule 32 Hearing)

11.    On June 5, 2001, defense counsel filed a motion for interpreter funds (Doc. 9, Respondent's Exhibit 1, MOTION FOR INTERPRETER FUNDS) and, on June 6, 2001, he filed a motion seeking the recusal of Circuit Judge Joseph Johnston (*id.*, MOTION TO RECUSE). A hearing was conducted by the trial court on June 8, 2001 as to these motions and with respect to Weed's competence to stand trial. (Doc. 9, Respondent's Exhibit 1, Supplement, June

8, 2001 Hearing) During the hearing, a hearing at which defense counsel waived

Weed's presence (*id*. at 3), the court denied the

m o t i o n   t o   r e c u s e [5]   a n d

---

[5]    The following colloquy preceded the court's denial of the motion to recuse:

THE COURT: . . . I've looked at [the motion to recuse] and have actually looked through the -- we're all given a -- from the Judicial Inquiry Commission, which I'm holding up here, all the opinions they issue and I went on line and other than, I guess, making an interesting motion, this is something we just do all the time. I have judges frequently to come to me, you got somebody on your docket that I've handled cases in the past for them, not for them I guess, dealing with them. Do you mind transferring them to me? It's just something that we do all the time. I think as long as a judge feels as if he can be fair it's left to the individual judge's discretion and I think I can certainly be fair in the case. I don't find any case, any opinions from the Judicial Inquiry Commission either in this jurisdiction or anything issued by any other jurisdiction that says the mere fact that you ask a judge to transfer a case to you creates some kind of impression that you can't be fair. But, John, you can certainly enlighten me if you want.

MR. WHITE:  Judge, I'm speaking from the actual feelings of my client and what he [h]as expressed to me.

THE COURT:  I understand.

MR. WHITE:  Being that he's deaf he's expressed to me through notes and also what his mother expresses to me through him.

THE COURT:  Is it the fact that I've revoked him in the past?

MR. WHITE:  Well, their feelings, Judge, and their position is, and this what's coming from them and by and through me as their attorney, is that being that the case was assigned -- what I'd like to do for the record is, not only is this a rendition but some sort of stipulation of the facts of what happened. If I say anything different from what you recall happening please –

---

THE COURT:  Yeah. Go ahead.

MR. WHITE:   But their feelings and problems is (sic) that the case was assigned to Judge McDermott, then he retired and the whole docket fell upon Judge Stout and they thought they were going to be assigned there. And they know who you are being that you handled the case before for him and did revoke him beforehand and they became aware that you went to Stout and asked him for this case and . . . the old case was terminated and over with. Their feelings are that you have got some sort of prejudgment or maybe your impartiality maybe is skewed by those actions of going and getting the file and bringing it back down here . . . coupled with the fact not only of you going and getting the case but refusing the settlement agreement that we had with the State. She sees that too. I say she, Scott sees that too. That's their feelings and their position is [] that maybe your impartiality has been skewed in reference to what a sentence should be for him. Basically, like I said, to go out of your way and go get the case. That's what their feelings are.

THE COURT:  Well, I guess just to correct the record slightly, I inherited his case from Judge Byrd who had actually taken the plea. If you recall the first time he was up for revocation I think it was you down here and Scott and his mother and about fifty people on the other side that wanted him revoked. I wouldn't revoke him; gave him another chance. Then I think he came up again for revocation a couple of months later and I revoked him. At that point he served his sentence and then I read one of the normal reports that we get about a year ago that this crime had been committed and low (sic) and behold I saw that it was Scott who had been alleged to have committed it. So I started looking for it to come through grand jury because the general rule around here is that we're assigned all criminal cases where we've previously had that Defendant on our docket. I know you take issue with that where the case is concluded. There's no written rule one way or another. I know Pat Rose has told you one thing. Of course, I don't want to get into he said, she said. But the general rule of why we like to have all criminal defendants' cases, whether they're over or not, is because we know a little bit of the history. When I say I know a little bit of the history, he has somewhat of a complicated history. If you looked at his prior case from four years ago, possession of burglary tools, I'm not so sure really describes his offense. In fact, when I first got that case and saw possession of burglary tools, II said, oh, come on. Burglary -- somebody's arrested for that and convicted of that, it can be a screwdriver and you know his burglary tools weren't necessarily that. It was camouflage clothing, a mask, you know, all this kind of stuff that at least the State contends his plans was to kidnap

and rape women. I mean, that was the plan. He had a real detailed psychiatric report. I think it was Van Rosen at the time, may have been someone else, that I think ended by saying, unless he got psychiatric treatment in prison that he would surely carry through on his fantasies of kidnapping and rape. And low (sic) and behold, that's what he may have in fact done if you believe the State's case. So from that point of view it was somewhat ominous that he had been released and the State had charged him with that offense. So I started watching it way before the indictment.

        We have gone since the time, four years ago to now, to a flat computer distribution of the files. As you know, four years ago when these files were being distributed Judge Johnstone actually assigned the cases. The reason for that was he would attempt -- and there were always mistakes not because it was him but just because of human error, to assign cases to each judge based on the fact that you previously had that defendant. We finally decided just to do it by computer as he, as you know, went to the Supreme Court and nobody else wanted to do that quite frankly. The computer does it now and we are often trading cases around because it becomes known, hey, you've gotten this guy for burglary one; he also has a robbery case on my docket. Let's put them altogether. Anyway I did go to Judge Stout and told him I had a history of this fellow, exactly what it was. He said, listen, if you want it, it's going to be a problem to deal with because he does have a handicap, we're going to have an interpreter, he transferred it to me. We weren't trying to hide that. I think we were pretty straight with you.  I think I can be fair in the case with all deference to your client. I know how she feels. Loving mother I'm sure. Her son is charged with a pretty serious offense. Mr. Naman, do you want to add anything?

        MR. NAMAN:        No, Judge, I will concur with you.

        MR. WHITE:   One other thing just for the record is about Pat Rose. Just as an officer of the court what she's basically told me, just for the record[']s sake, is that once a case is terminated, which in this situation it was because he was revoked, that it doesn't -- the next cases don't follow to that judge.

        THE COURT:  And for the record, Judge Kendall has told me that that's not true.

        MR. WHITE:   And also for the record, before I filed this dad-gummed motion, I went to Judge Kendall and let him know that I was doing this so he wouldn't

granted the motion for interpreter funds[6] (*see* Doc. 9, Respondent's Exhibit 1, June 8, 2001 Hearing Tr., at 3-9 & 12-13).[7] It is also apparent from that hearing that the parties were having ongoing plea discussions which could lead to settlement of the case at some point in time. (*Id*. at 12-13)

12.   On June 11, 2001, the date Weed's trial was to begin (Doc. 9, Respondent's Exhibit 5, CASE ACTION SUMMARY SHEETS), a problem arose regarding the interpreters. (Doc. 9, Respondent's Exhibit 1, June 11 & 12, 2001

_____

get -- chew me out for filing this.

        THE COURT: Listen, you've got to do what you have to do. . . . My problem is that anytime a defendant feels that I'm biased because I've revoked him in a previous case, sooner or later I'm not going to be able to try any cases. That's the problem I've got. With all due respect I'm going to deny your motion.

(*Id*. at 3-5; *see also* Doc. 16, Exhibit B, Tr. 6-9)

_____

[6]        The trial judge signed the following order regarding the interpreter issue on June 7, 2001: "It is hereby ordered that the State will provide the funding for an interpreter(s) for the Defendant during trial proceedings and also his psychological evaluation by Dr. James Chudy." (Doc. 9, Respondent's Exhibit 5, June 7, 2001 ORDER) Based upon the discussion among counsel and the court during the June 6, 2001 hearing, it is clear that all involved anticipated the presence of two interpreters for Weed's trial (Doc. 9, Respondent's Exhibit 5, June 6, 2001 Hearing Transcript, at 12-13)

[7]        Defense counsel admitted during the hearing that his own psychologist, Dr. Chudy, had failed to indicate one way or another whether Weed was competent or incompetent to stand trial. (*Id*. at 10) Counsel informed the court that he was going to get Chudy to supplement his report on the question of competence, whereupon the court informed counsel that should the doctor determine Weed to be incompetent "get with Edmond [the Assistant District Attorney] pretty quick and we'll see what we can do Monday in that regard."(*Id*. at 11)

Proceedings)

THE COURT:        Let's go on the record. Why don't we maybe kind of rehash what was done in chambers this morning?

MR. WHITE: Okay. . . . [F]or the record, Daniel Scott Weed is one hundred percent deaf and communicates only through sign. This past week I drafted up an order to have the interpreters here which Your Honor signed. . . . [B]asically what they wanted was an order saying that the State of Alabama was going to be responsible for their fees and their funding which I did and which Your Honor signed and sent it to them. What's happened is, and I have learned this morning, is they will not be []here unless their name was in particular on the order. . . . What I've got here is I've got one interpreter here, Tim Godwin. He is the counsel here so I can communicate with Scott at the table.  If there are any questions that Scott wants to ask me or vice versa. I want to go to him. I need another interpreter[.] To cut to the chase, the two people did not show up. They're not here. The Court wanted me to fix it; I can't fix it because one of the two is out of town and the other one will not come to court and do it unless they have somebody to validate what they interpret. In other words, they won't do it by themselves. I don't have an interpreter here for what's going on on the stand, what's being questioned and what's being answered from the stand so Scott's not going to know what's going on. I'm asking for a continuance because even if I could get the one who's in town  -- What is her name, Tim?

INTERPRETER:        Lisa Gould.

MR. WHITE:  Lisa Gould. She won't come unless she's got somebody to validate her. Why they have that rule I don't know but they won't do it. So I've got an interpreter here so I can communicate with Scott who is our defense interpreter but we don't have anybody to interpret what's being said on the stand and I'd like to put Tim on the record.

THE COURT:        . . . Are you telling me that during this

17

trial we would need three sign language interpreters?

       MR. WHITE:  That's what I'm telling you, Judge. . . . Tim, who is here, he's not going to do it by himself because . . . he doesn't want to put his credentials on the line for liability purposes and he's going to tell you that. But he is the one that's at our table so I can communicate with Scott. The other ones that do the interpreting for the witnesses on the stand, they will not come unless it's two of them. That's what I'm learning, and that's what Tim is going to put on the record, because they validate each other.

.     .     .

       THE COURT:     Frankly, I'm just not buying this. I think it's a lame excuse to get another continuance.

       MR. WHITE: Judge, . . . I'm just learning this this morning. I want Tim to explain it to you on the record what my dilemma is. Is that okay?

       THE COURT:     Sure.

(*Id*. at 3-6) The "defense" interpreter, Tim Godwin, gave sworn testimony that he considered it a conflict of interest for him to "interpret for the State attorney and also it would be a conflict for me to try to interpret proceedings in the court since I am for the defense." (*Id*. at 6) Godwin also testified that two other interpreters were not available to be in court; one interpreter he had been in contact with from Atlanta would not make herself available because she was not specifically identified on the order granting the motion for interpreter assistance and that another local interpreter that he had lined up to help would

18

not show up since the Atlanta interpreter was going to be a no-show. (*Id*. at 8) The court continued the questioning of Godwin on the conflict of interest issue in the following manner:

> THE COURT:     I want to stay on this subject. Let's say Mr. Naman called one of the victims . . . and . . . [was] asking her to describe actions she claimed that the Defendant . . . committed on her. Is Tim claiming that he would have a conflict in interpreting that? Tim, I'm asking you.

> MR. GODWIN:     I can interpret what's being asked and the questions. The problem is that if I'm the only interpreter here I have no one that's going to be able to validate that I did not make an error when I'm signing. . . . The conflict there comes in is for Mr. Weed to know who is actually speaking and asking questions and who's answering the questions and for the fatigue part of this that would happen with only one interpreter. . . .

> THE COURT:     I'm hearing a couple of things. The fatigue factor I understand because at one time I thought it was for a fatigue factor that maybe every hour that you would change with someone else. But we have all the time foreign language interpreters here. We always have one person. . . . I have no idea whether they're being interpreted correctly. We don't have two people to validate or three people to validate or someone who is a defense interpreter versus a state interpreter. Frankly, what you're telling me is incredible. I really don't know whether I can authorize the State of Alabama to pay these funds. When I was initially approached – because Mr. Weed has not been declared indigent – it was that his mother had scraped together just about all of her funds to employ Mr. White as defense counsel and could the State pay for an interpreter. If that's the case, sure. The next thing I know we're talking about three interpreters and what I'm hearing this morning is perhaps more . . . . Sure we want him to know what's going on. I think that's a due process right[.] . . . We had a case here that we just went to trial on. It was a Giardini case. But we had an interpreter show up and maybe they weren't,

quote, certified that your organization requires but the Courts of this state don't require any certification. All that it requires is that it be accurately done. I appreciate your groups striving to better themselves but I can't believe that we're going to need three, four, five people in here interpreting.

MR. WHITE:  Judge, one thing I would like to ask Tim[.] . . . Is he going to be able to competently interpret what's going on during the trial from all witnesses, all the direct and all of the cross-examination and everything that's going to happen and also be able to communicate between Scott and myself, if we have any discussions to go on[?] . . .

MR. GODWIN:      I'd say no. With one interpreter . . . the breakdown in communication is going to be too much of a variable in this.

MR. WHITE:  Are you not going to be able to relay the information to Scott where he knows what's being said from the witness stand totally and keep up with everything?

MR. GODWIN:      I wouldn't say totally but I would say that there's going to be a percentage of lost information that's going to probably happen with only one interpreter. . . . To clarify, there would not be a need for no more than three. The other two interpreters would be specifically handling the State attorney's and this defense attorney's questions being posed to the witnesses and the responses from the witnesses. . . . Essentially I would be the interpreter just for the defense so that they can have their private conversations.

MR. WHITE:  What my position, Judge, is is that Tim  was originally and has always been the person who was going to be our interpreter to sit here at our table with Scott so if he has any questions to tell me or whatever. . . .

THE COURT:      Isn't that what a notepad is for?

MR. WHITE:  I can use that notepad [] [b]ut me listening to

20

witnesses and writing notes back and forth to him, it would be a lot more thorough . . . . And I'm not trying to come up with some lame reason to continue this thing. . . .

THE COURT:      It sounds like it to me. You mentioned once or twice last week you wouldn't mind a continuance and then now here we are, we have some witnesses that quite frankly probably spent the whole weekend dreading this morning . . . . Well, we're going. Bring the jury in. Do you have anything else to say?

MR. WHITE:  I would just like to put on record, Judge, that Scott's not going to be able to get all the information that's gathered through the interpreter here. He's not going to be able to hear the proceedings that are going on. He's going to be denied his civil rights. He's going to be denied due process and . . . he's not going to know what's going on during the trial.

THE COURT:      Do your best and you can call for another interpreter. You've got a couple of hours probably until we get into the testimony. All right. Bring them in and line them up.

(Defendant signing.)

THE INTERPRETER:      You're violating my rights.

(*Id*. at 9-13)

13.    Following the jury selection process (*id*. at 13-54), however, the court recessed for the day to allow the defense to garner another interpreter (*see id*. at 54-60).

THE COURT:      My intention is to move forward in the morning. One of the reasons that I wanted another interpreter is for Tim's benefit we would have to have very frequent breaks, probably every half an hour. I think we can do that but it's going

to become very cumbersome to do that. With two interpreters we're going to be able to move a little more steadily. Tim, Mr. Godwin, here may be able to find us somebody else that will help him. As you can see it's fairly exhausting work here and after four or five hours of doing that it's going to be tough to get a lot of testimony in one day. So it's an attempt to try to accommodate him and also to avoid any problems in the future. We will get started one way or another tomorrow at nine o'clock. We will see you all then.

(*Id*. at 60)

14.    The following day, June 12, 2001, Weed changed his pleas of not guilty to first-degree robbery and first-degree sodomy and entered counseled guilty pleas to those charges. (*Id*. at 62-73)

THE COURT:          Tim, you tell me if I'm going too fast; all right? You are Daniel Scott Weed; is that correct?

THE INTERPRETER:          (After translating) Yes. Yes, sir.

THE COURT:          Mr. Weed, you are a deaf mute; is that correct?

THE INTERPRETER:          (After translating) Yes.

THE COURT:          And you can understand through sign language; is that correct?

THE INTERPRETER:          (After translating) Yes.

THE COURT:          And through Mr. Godwin you can understand what I'm saying; is that correct?

THE INTERPRETER:          (After translating) Yes, sir.

THE COURT:            And you can read and write; is that correct?

THE INTERPRETER:            (After translating) Yes, sir, I do.

THE COURT:            And read and write in the English language?

THE INTERPRETER:            (After translating) Um, yes, sir.

THE COURT:            I need to spend a few minutes with you to make sure you understand all of your constitutional rights. If there is something that you don't understand I want you to stop me and I'll rephrase the question.

THE INTERPRETER:            (After translating) Okay.

THE COURT:            Anything that requires an answer I need you to tell Mr. Godwin here to answer for you because we tape record these proceedings; all right?

THE INTERPRETER:            (After translating) Yes, sir.

THE COURT:            You're pleading guilty here today to Robbery in the First Degree and Sodomy in the First Degree. Do you understand that?

THE INTERPRETER:            (After translating) Yes, sir, I am pleading guilty.

THE COURT:            Do you understand because you've been convicted of a prior felony in each of these cases the sentence range is ninety-nine years to life?

THE INTERPRETER: (After translating) Yes, sir.

THE COURT:            I may have said that wrong. It's

23

fifteen years to life. Do you understand that in each of these cases?

THE INTERPRETER:            (After translating) Yes, sir.

THE COURT:            Do you understand also the attempted rape case is going to be nolle prossed or dismissed today? Do you understand that, Mr. Weed?

THE INTERPRETER:            (After translating) Yes, sir.

THE COURT:            Do you understand, Mr. Weed, you don't have to plead guilty here today?

THE INTERPRETER:            (After translating) Yes, sir, I do understand.

THE COURT:            Do you understand that you can plead not guilty or not guilty by reason of mental disease or defect?

THE INTERPRETER:            (After translating) Yes, I understand that I can say that.

THE COURT:            And in that case we would continue with your jury trial?

THE INTERPRETER:            (After translating) Yes, sir, that's correct.

THE COURT:            And if your case were tried before a jury you and your attorney would have the right to confront and cross-examine your accusers?

THE INTERPRETER:            (After translating) Right, yes, sir. I understand.

THE COURT:            And if your case were tried before a jury you and your attorney would also have the right to subpoena witnesses to testify in your own behalf?

24

THE INTERPRETER:            (After translating) Right.

THE COURT:        Do you understand that in the eyes of the law you are presumed innocent of these offenses and it's the burden of the State of Alabama to prove your guilt beyond a reasonable doubt?

THE INTERPRETER:            (After translating) Yes, sir.

THE COURT:        Do you understand that if this case were tried before a jury you could exercise your rights under the U.S. Constitution not to testify and if you chose to do so that fact could not be used against you by the State of Alabama?

THE INTERPRETER:            (After translating) Right, yes, sir.

THE COURT:        Do you understand that if this case were tried before a jury and if you were convicted by a jury, you would have the right to challenge the composition of the grand jury that indicted you and also the composition of the twelve-person jury that convicted you?

THE INTERPRETER:            (After translating) Yes, sir.

THE COURT:        Do you also understand that if this case were tried before a jury and if you were convicted by that jury you would have a right to appeal your conviction?

THE INTERPRETER:            (After translating) Right, yes, sir.

THE COURT: Do you further understand that if you did not have the money to appeal your conviction that I would appoint you an attorney who would appeal the conviction for you free of charge?

THE INTERPRETER:            (After translating) Yes, sir.

25

THE COURT:          Do you further understand that should you be convicted by a jury you would have a right to ask for a pre-sentence investigation, a suspended sentence or you would even have the right to ask for probation?

.          .          .

THE INTERPRETER:          (After translating) Yes, sir.

THE COURT:          Mr. Weed, do you understand that you're giving up all these rights that I've told you about by pleading guilty here today?

THE INTERPRETER:          (After translating) Yes, sir.

THE COURT:          Thank you, sir. Mr. Naman, what would you expect the State to be able to prove if this case were tried?

MR. NAMAN:          Judge, we expect that the evidence would show that on June the 30th of the year 2000 at 2:15 p.m. the Defendant in this case, Mr. Daniel Scott Weed, entered the Acquisitions Gift Shop located at 1218 Hillcrest Road in Mobile County. He was armed with a handgun and he approached the victims in this case Mrs. Shannon Snow and Ms. Connie Guggenbiller and at gunpoint, demanded them to go to the back of the store. He handed Ms. Guggenbiller a three-by-five notepad which stated the following[:] I will kill you if you don't listen to me. I want you to give me all of your money that you have. Ms. Guggenbiller could tell from his actions and his grunts that he was a deaf mute. He directed them next to the front of the store and ordered Ms. Guggenbiller to lock the door. When she couldn't do it because of her nerves he took the keys from her and locked them himself. He then brought Ms. Guggembiller and Ms. Shannon Snow, the other victim in the case, to the cash register and directed Ms. Guggenbiller to empty the cash register. She took the white plastic sales bag and emptied the register of all its contents. He then forced both the women back to the back store room and demanded that they undress. They took off clothing and

26

he demanded more and more until they were completely undressed. He asked them to lie in the bathroom and then pulled Ms. Shannon Snow from the bathroom and ordered her to lie on the floor outside the store room. He attempted at that time to have sex with Ms. Snow but he could not get an erection. **He then ordered Ms. Snow to perform oral sex on him. During this time his gun remained aimed and touching her face. He pulled out of Ms. Snow and ejaculated on the floor and some of his semen landed on a cardboard box in the store room**. He then again attempted to rape Ms. Snow but again had a problem with an erection. He again them ordered Ms. Snow to perform oral sex on him. After having trouble gaining an erection he became frustrated and ordered Ms. Snow back into the bathroom with Ms. Guggenbiller. They heard the Defendant rummaging through the store and later leaving the store, some five minutes later. The ladies waited in the bathroom until some time had passed and then came out after dressing and called the police. Ms. Guggenbiller noticed first that the keys to her store had been taken from the store and that her purse had been rummaged through and her license was missing as well. As the police came **Ms. Guggenbiller [] and Ms. Snow described the Defendant as being a white, deaf mute, five ten to sit foot tall, one hundred and sixty-five to one hundred and seventy-five pounds. They noticed him to be left handed, wearing blue jeans and white tennis shoes. The gun that he used was described as . . . resembling one from an old western movie.** The police also found that the note pad that . . . the Defendant used to communicate with the victims and it was found behind the counter in the store. **The police then developed leads about a possible suspect and then went to the home of Ms. Linda Weed. . . . She told them that the Defendant had left the house around seven a.m., he had stolen money from her and was using drugs. She told the police that he would be driving a white 1987 Chevy Chevette. The police asked about a gun or a possible gun and she told police that they had one gun, that it was [a] kit gun and that she kept it in a box in a back room. She went to retrieve it and the box was empty. It was an old western-style gun she told the police.** A BOLO was placed for the Defendant and at 8:40 [p.m.] on that day Sgt. Darryl Williams

27

and Officer John Sprinkle with the Mobile Police Department spotted the Defendant at the Exxon gas station on Government Street and Azalea Road and called for marked police cars to respond. **Officers attempted to stop the Defendant but he fled and on a high speed chase through neighborhoods in the Cross Creek and Shortleaf Drive Subdivision, Officer Chad Robbins and Officer Bobby Gechijian caught the Defendant after the Defendant lost control of his car and led them on a brief foot chase. At that scene a notepad similar to the one left at the scene by the Defendant was found on Mr. Weed. Identification Officer Lawrence Jernigan was called to the scene where Mr. Weed was arrested. He found inside of the car a white plastic bag with money taken from the crime. It was the same white plastic bag that Ms. Guggenbiller had filled with money. He found a gun matching the description of the one used in the crime, a set of keys belonging to Ms. Guggenbiller, a woman's sports bra and panties, a piece of paper with Acquisitions store hours on it was found inside the Defendant's '87 Chevette.** . . . DNA evidence was collected from the cardboard box at the store where the crime occurred and . . . scientists matched the DNA to Mr. Weed . . . -- the report would have stated that there was a chance of one in one hundred and sixty-seven million white males actually sharing that same DNA or one in three hundred and thirty million black males[.] . . . Mr. Weed was charged with . . . Robbery First Degree, Attempted Rape First and Sodomy First. All of this of course occurred in Mobile County.

THE COURT: Thank you, Mr. Naman. Mr. Weed, are you pleading guilty to these offenses because you are in fact guilty?

THE INTERPRETER: (After translating) Yes, I am.

THE COURT:        Has anybody made any physical threats against you in order to get you to plead guilty?

THE INTERPRETER:        (After translating) No, sir, I'm the one who made the decision.

28

THE COURT:          Has anyone made any offers of monetary reward to you in order to get you to plead guilty?

THE INTERPRETER:          (After translating) No, sir.

THE COURT:          Do you understand that since you're pleading guilty to two felonies the law requires an imposition of a Victim's Compensation Assessment in each case of a minimum of fifty dollars?

THE INTERPRETER:          (After translating) And what does that mean? . . .

THE COURT:          It's a court cost tax of fifty dollars in each case.

THE INTERPRETER:          (After translating) Okay. I got it. I understand now.

THE COURT:          Mr. Weed, do you understand the ramifications of pleading guilty to two felonies in light of the fact that you have previously been convicted of one felony and also in light of the fact that Alabama has an Habitual Offender Act?

THE INTERPRETER:          (After translating) Yes, I do.

THE COURT:          Mr. Weed, I'm going to show you what we have marked as Court's Exhibit Number One. It is a document that appears –

MR. WHITE:  He signed the back of that front page, Judge.

THE COURT:          Let's see. Okay. It appears to be signed by you, Mr. Weed. Did you in fact read and sign this document that is entitled Explanation of Rights and Plea of Guilty?

THE INTERPRETER:          (After translating) Yes, sir. Yes, I did.

29

THE COURT:          All right. And Court's Exhibit Two, Notice of Intent to plead guilty, did you read and sign that document?

THE INTERPRETER:          (After translating) Yes, sir.

THE COURT:          All right. For the record, how do you wish to plead to the charges of Robbery in the First Degree and Sodomy in the First Degree, guilty or not guilty?

THE INTERPRETER:          (After translating) Guilty on both charges.

THE COURT:          All right. The Court accepts your plea of guilty. Would you like to say anything before sentence is imposed?

THE INTERPRETER:          (After translating) No, sir.

THE COURT:          The Court hereby sentences you to life in the state penitentiary in each case, which will be concurrent in each case, fifty dollars Victim's Compensation Assessment in each case plus court costs. This matter is hereby concluded. Court is adjourned. The other case is nolle processed, the attempted rape.

(*Id*. (emphasis supplied))

15.     On June 22, 2001, Weed gave oral notice of appeal and on that same date the trial court appointed Glenn Davidson, Esquire, to represent petitioner on appeal. (Doc. 9, Respondent's Exhibit 1, CASE ACTION SUMMARY SHEETS) Weed filed written notice of appeal on June 26, 2001. (Doc. 9, Respondent's Exhibit 1, NOTICE OF APPEAL)

16.     On appeal, Weed raised the sole claim that the trial court erred in

failing to grant his motion to recuse. (Doc. 8, Respondent's Exhibit 2, at 6)   In

affirming Weed's convictions and sentences, the Alabama Court of Criminal

Appeals, by memorandum opinion dated August 27, 2004, rejected, on

procedural grounds, petitioner's sole appellate issue. (*See* Doc. 8, Respondent's

Exhibit 4)

> "It is clear that by pleading guilty, a
> defendant waives all nonjurisdictional defects
> occurring before the plea. See, e.g., <u>Martin v. State</u>,
> 579 So.2d 69, 70 (Ala. Cr. App. 1991). Because 'a
> guilty plea represents a break in the chain of events
> which has preceded it in the criminal process,'
> <u>Tollett v. Henderson</u>, 411 U.S. 258, 267, 93 S.Ct.
> 1602, 1608, 36 L.Ed.2d 235 (1973), we have
> required a defendant who wishes to appeal an
> adverse ruling on an issue raised prior to the entry
> of the plea to inform the trial court, <u>at the time he</u>
> <u>enters his plea</u>, that he intends to reserve that issue
> for appeal. See <u>Sawyer v. State</u>, 456 So.2d 110
> (Ala. Cr. App. 1982), reversed after record
> supplemented, 456 So.2d 112 (Ala. 1983). The
> defendant's plea is, in effect, conditioned on his
> right to appeal the prior adverse ruling. See 2 W.
> LaFave & J. Israel, <u>Criminal Procedure</u>, § 20.6(b)
> (1984). Recently, Justice Maddox summarized the
> Alabama law on this point as follows:
>
> > "'Ordinarily, a guilty plea
> > waives all nonjurisdictional matters,
> > including a trial court's refusal to
> > suppress evidence, but this Court
> > has, by case law, permitted an
> > exception to that general rule when
> > a defendant <u>specifically reserves</u> his
> > or her right to appeal such a ruling

on a motion to suppress, as this petitioner did. <u>Ex parte Sawyer</u>, 456 So.2d 112 (Ala. 1983) (defendant allowed to supplement record on appeal to show that search and seizure issue was reserved when the plea of guilty was entered).'

"<u>Ex parte Hergott</u>, 588 So.2d 911, 916 (Ala. 1991) (Maddox, J., dissenting) (emphasis in original).

"As Justice Maddox's parenthetical explanation of <u>Sawyer</u> indicates, a defendant must reserve his right to appeal an adverse ruling on a[n] issue arising before the plea '<u>when the plea of guilty [is] entered.</u>' The reason behind such a requirement is clear: because a guilty plea waives all nonjurisdictional defects in proceedings occurring before the plea, <u>Martin</u>, supra, and 'a guilty plea represents a break in the chain of events which has preceded it in the criminal process,' <u>Tollett</u>, supra, an unconditional plea must be taken to represent the defendant's decision to forego any challenge to events occurring before the plea. If the defendant does not intend to forego such challenges, he must make that intent clear <u>before</u> he enters his plea.

". . .

". . . The timing of a 'reserved plea' is significant not only because an 'unreserved plea' waives all nonjurisdictional defects prior to the plea, but also because it is the policy in this state for all parties to 'lay their cards on the table' <u>before</u> a guilty plea is accepted. See Rules 14.3(a) and (b), A.R.Crim.P. (mandating that the terms of a plea bargain agreement be disclosed 'in open court prior to the time a plea is offered'); <u>Ex parte</u>

Yarber, 437 So.2d 1330 (Ala. 1983) (recognizing that the terms of a plea agreement must be presented to the trial court before the plea is entered); Ex parte Cassady, 486 So.2d 453, 456 (Ala. 1986) ('[i]f parties would reduce their plea agreements to writing and present them to the trial court prior to sentencing, rather than afterwards, . . . resolution of cases questioning the existence or contents of plea agreements would be greatly facilitated'); Ex parte Swain, 527 So.2d 1279, 1280 (Ala. 1988) (same); Congo v. State, 455 So.2d 896, 897 (Ala. 1984) (Adams, J., dissenting) ('[s]ince Yarber, if the prosecution and the defendant have reached an agreement, such agreement must be submitted to the trial judge'). When one party does not lay all his cards on the table before pleading guilty, he cannot expect either the trial court or a reviewing court to help him achieve the expectations he did not express at the time he pled guilty. See generally Yarber, supra, and Bailey, supra."

Prim v. State, 616 So.2d 381, 382-83 (Ala. Crim. App. 1993) (some emphasis added). The appellant did not specifically reserve his right to appeal this issue when he entered his guilty plea. Additionally, the written plea agreement does not contain the provision that the appellant would reserve the right to appeal this issue, and the record does not indicate that that was a condition of the plea agreement. Therefore, the appellant's argument is not properly before this court, and we affirm the trial court's judgment.

(Id.)  Weed's application for rehearing was overruled on December 14, 2001

(Doc. 9, Respondent's Exhibit 5, Notice) and the certificate of final judgment

of affirmance was issued by the Alabama Court of Criminal Appeals on January

2, 2002 (Doc. 9, Respondent's Exhibit 5, CERTIFICATE OF JUDGMENT)

33

17.    On December 24, 2002, James Curenton, Esquire, entered his notice of appearance as counsel for petitioner and concurrently therewith filed a Rule 32 petition collaterally attacking Weed's convictions and sentences. (Doc. 9, Respondent's Exhibit 5, CASE ACTION SUMMARY SHEETS) Weed raised the following claims in his Rule 32 petition: (1) a *Brady* violation; (2) a due process and equal protection violation due to Alabama's failure to guarantee that deaf mutes receive the same process and treatment afforded non-deaf defendants; (3) a due process and equal protection violation on account of the denial of his right to know the evidence against him, to have sufficient time to evaluate that evidence, and to assist in his defense as a result of being denied sufficient funds for interpreters and the withholding of exculpatory evidence; (4) ineffective assistance of trial counsel; and (5) ineffective assistance of appellate counsel. (Doc. 9, Respondent's Exhibit 5, RULE 32 PETITION) The State filed its response to the petition and a motion to dismiss on January 3, 2003. (Doc. 9, Respondent's Exhibit 5, STATE'S RESPONSE TO RULE 32 PETITION AND MOTION TO DISMISS)

18.    On January 14, 2003, the trial court entered an order disposing of the *Brady* claim and setting issue two, one of the due process and equal protection violation claims, for a hearing. (Doc. 9, Respondent's Exhibit 5, January 14, 2003 ORDER)

As to the Petitioner's claim that a <u>Brady</u> violation occurred the Court finds that this claim is merit less. The Court takes judicial notice of the Court file which Ordered "open file" discovery. Thus, the Petitioner and his attorney were invited to make an appointment to view all forensic items, which are being complained of in the instant petition. Thus, there can be no <u>Brady</u> violation.

Even if there was any merit to the Petitioner's <u>Brady</u> claims, the Court finds that this is a constitutional claim which is precluded in that it could have been raised at trial. Rule 32.2(a)(3). Furthermore, Petitioner's plea waived all nonjurisdictional defects. See <u>Weed v. State</u>, _____ So.2d ____ (Ala.Crim.App. 2001, No. CR-00-2025). Accordingly for the foregoing reasons the Petitioner's claims raised in "<u>ISSUE 1: BRADY VIOLATION</u>" are hereby DISMISSED.

The Court hereby sets oral arguments for the Petitioner's claims of "<u>ISSUE TWO: DUE PROCESS AND EQUAL PROTECTION VIOLATION</u>" on February 14, 2003 at 1:30 p.m. As to the Petitioner's request for a discovery scheduling order it is henceforth **DENIED**. There is no automatic right to discovery in a Rule 32 proceeding. <u>Ex parte Land</u>, 775 So.2d 847 (Ala. 2000). If the Petitioner needs any particular document or other item that is not accessible, the Court will Order it to be produced prior to the hearing. By separate Order the Court is ordering the prisoner returned for the hearing.

(*Id*.) The trial court entertained oral arguments from counsel on the second issue raised by Weed in his Rule 32 petition on February 14, 2003. (Doc. 9, Respondent's Exhibit 5, Rule 32 Hearing Transcript, at 4-33)

THE COURT:       Mr. Curenton, interesting issue, the interaction between the Americans with Disability Act and the requirement in Alabama law regarding interpreters. Would you like to address that?

MR. CURENTON:   . . . [T]he Americans with Disability Act of 1990, title two in particular, sets out federal law concerning . . . what reasonable accommodation has to be given to disabled persons in state courts and other governmental entities. . . . And what is contained in there are standards of accessibility. And our whole argument on this particular issue is that if a deaf defendant in a criminal case cannot access the information then he may as well not be in court at all because he does not understand all that is going on. That's not to say that a deaf individual doesn't get pieces of the information. But if he cannot access, and I believe the language in the ADA is, the language in court and the words that are spoken, he must access it effectively, accurately and it must be interpreted impartially. What that means is that he has to understand what's said in all the conversations and he must be able to have it expressed to him accurately in order to understand it. Anything less than that is not in compliance with ADA. . . . The code of ethics which Mr. Godwin tried to bring up in the court proceedings makes it impossible for him to interpret for the defendant and his attorney and also interpret the court proceedings. He is subject to attorney/client privilege information and it has to be strictly confidential. He cannot interpret the broader proceedings. He asked for two interpreters to be here and there were two as I recall who would have done it but did not come for some reason or another. I recall they didn't get an approval for compensation.

THE COURT:        That's not true. It was reset a day or two later and they couldn't be obtained.

MR. CURENTON:   Yes, and federal law says that it's not his burden to provide interpreters.

THE COURT:        Where does it say that, Mr. Curenton? Give me the cite. . . . And I also need the cite that it applies to proceedings in state court.

MR. CURENTON:   . . . What I'm looking at, Your Honor, is a forty-three page publication title two Technical Assistance Manual published by the Department of Justice interpreting the

36

ADA as it applies to state and local government programs and services. You will have to give me a second. I have a number of places marked.

.        .        .

MR. CURENTON: . . . There are two sections in particular. One is in title two in ADA section 3.5400, it's entitled surcharges. This particular section says that if compliance results in additional costs the public entity may not place a surcharge only on particular individuals with disabilities or groups of individuals with disabilities to cover these expenses. Then in title two section 4.3200 . . . [t]here's a definition and examples of reasonable accommodation[] . . . and after the definition . . . there are some examples and . . . the fourth example is providing readers or interpreters. And the other . . . manual that I managed to get my hands on is a standard practice paper from the Registry of Interpreters for the Deaf, Incorporated. The first page of this three-page document [] states that State and local courts and administrative agencies are subject to title two and neither courts nor attorneys may pass along the cost of interpreting service to the deaf or disabled person directly or indirectly.

THE COURT:        I understand that. I'm particularly interested though in cases, particularly federal cases, where a federal court would have determined that the Americans with Disability Act applies to proceedings in State court. I don't think it's there. . . .

MR. CURENTON:    In the area of due process, I don't know of any cases. . . . My argument is that our constitution, state and federal, says that the accused has to receive due process. Of course we don't get a definition. We'd have to hash that out over years and through various cases and different factual circumstances. And in this case where we have a deaf defendant, in order to determine what is due process for that type of individual I don't know what to do other than to look at the standards that were set in the ADA by [C]ongress and to listen to experts and professionals in the field.

.   .   .

I don't think that any sign system can interpret language that we use in court to a deaf person in the same way that we hear it. I think it's impossible. What they do is . . . they draw a picture of it so-to-speak.

       THE COURT:      Let me interrupt you there for a minute. Couldn't the same argument be made . . . where we have a Cambodian defendant that the translation of legal terms into maybe a particular dialect of Cambodian is practically impossible? And as I understand our law it does not require . . . that the defendant hear or understand every word but just substantively be advised as to what the proceedings are, how they're progressing. They may not get every word. . . .

       MR. CURENTON:    I think that's an analogy that a lot of people make and in some instances it may apply but I don't think it can be applied as a whole because interpreting is not translating language. There's a world of difference between the two. Every word we use has not interpretive sign. In looking at what those standards are for deaf people as far as what is due process, I think we have to look at the ADA standards. I think we have to listen to the professionals in the field who have dealt with these disabilities far more than us and listen to them when they say that one interpreter is needed in court for the attorney and his client to preserve the privilege and that two interpreters are needed for the proceeding itself for several reasons[:] one, because the one doing the interpreting has a fatigue factor after twenty to thirty minutes and, secondly, because the one not doing the interpreting can verify the translation or the interpretation. . . .

       THE COURT:      Let me ask you. Why hasn't that been applied to, as you term them, translation cases where courts have held in the past that a single interpreter was sufficient?

       MR. CURENTON:    I can't answer that question. . . . I guess the issue hasn't been raised. []

38

THE COURT:       One case that I've got in my file and I'll share with you, . . . one translator to use your term, translated for I think eight different defendants and that same issue was raised that how could he be the translator for eight separate defendants.

MR. CURENTON:    I would just say there's a difference in translation and interpretation.

THE COURT:       There may be but not on the argument that you're raising of privilege because it seemed if that was the argument then how could that translator be involved in it when there was a privilege between one defendant and the lawyer and the other defendant and a lawyer?

.      .      .

MR. CURENTON:    I don't know what the code of ethics is for translators. But I've been reading the code of ethics for interpreters and they have a strict code of ethics and I don't know how we could require interpreters in the position that Mr. Godwin found himself in this case, to interpret between the attorney and his client, and hear things that are privileged, and then do the proceeding itself. I mean, he's bound by his code of ethics not to do that. . . . [T]he state attorney and I were discussing this at the break, and his question was . . . why should the court have to pay just because the interpreters have a code of ethics and my response was, well, what if they refuse to interpret. We wouldn't have any interpreters. I think we have to look to those standards. And . . . in this case I think we have something that we can talk about. . . . In this case my client entered a plea of guilty to a sex crime that required sexual conduct when there were DNA test results in the DA's file that excluded him. . . . I know the court says there's an open [file] discovery rule but if you look at the dates those test results were not sent to the DA until twenty-days before the hearing started, the trial. Maybe Mr. White looked at it prior to that time. Maybe the DA never saw it. But in any event somehow in all the discussion that occurred on the day of the plea my client pleaded to a sex crime requiring sexual contact when

the DNA test said he was excluded.

THE COURT:        Well, I'm not so sure you're correct about it. There was never any allegation of penetration. . . . [The] [s]odomy that he pled guilty of was oral sodomy on him and the forensics were vaginal swabs.

MR. CURENTON:        No, they had an oral swab.

THE COURT:        Did they?

MR. CURENTON:        They had an oral swab too and it was her husband. I don't believe he would have pled guilty if [he] would have known that which leads to the point, I'm not sure he understood the elements of that crime. I think somewhere in all this process . . . he could not access the information and he stands now convicted of a sex crime which is far different from being just convicted of robbery. Not only is it different while he's in prison and in trying to accumulate time to be paroled but once he is released it's going to make a vast difference due to registration and things like that. . . .

THE COURT:        Okay. Mr. McGowin?

MR. MCGOWIN:        Just something that struck me as odd about the ethics of Mr. Godwin who interpreted at the original trial, that how could he interpret between the defendant and Mr. White and then interpret witnesses and other people. The simple answer to that is he's not testifying and he's not giving any information. He's just repeating what others say and I don't understand the point. Also in sodomy[,] emission is not required. The testimony of a witness alone is sufficient to convict somebody for sodomy. . . . I researched and found several actual federal habeas proceedings concerning state court proceedings dealing with deaf defendants and interpreters. . . . [T]he [federal] circuits say that the U.S. Supreme Court has never held that under the U.S. Constitution a defendant has a right to an interpreter in order to give them due process. They leave it within the sound discretion of the trial court . . . . Specifically[,] . . . Phillips v.

Miller[,] . . . a habeas proceeding concerning a New York State conviction for rape, sodomy and robbery and sexual abuse by a deaf defendant who claimed that he was denied the right to confront witnesses against him at trial because he was hearing impaired[.] . . . It goes on to state that the . . . decision of whether or not to appoint an interpreter is a matter largely resting in the discretion of the trial court. . . . I think the other thing he was citing was some internal . . . professional agreement on how things should be done in the best case scenario.

.         .         .

The Miller case goes on to talk about New York law, Illinois law and then Alabama law and it cites the Terry case cited by Mr. Curenton for the proposition that Alabama has ruled that a deaf indigent defendant was entitled to a court-appointed interpreter under the Alabama State Constitution. It says, since the federal constitution is a floor and not a ceiling and there appears to be no constitutional right to an interpreter, there is no violation to the federal constitution hearing. The only possible violation would be due process under the Alabama Constitution. But if you read the cases cited by Mr. Curenton . . . it's within the sound discretion of the trial judge. . . . [I]t even alludes to the statute that he's saying that Mr. White should have . . . raised was unconstitutional[] [f]or the fact that if the defendant doesn't even ask for an interpreter the court doesn't have to appoint one. . . . [I]t's within the discretion of the court. There's nothing there about how many or anything like that. The Turner case . . . states that . . . all the law contemplates is that the accused know and understand the nature of the accusation he's called upon to answer when there is no request for an interpreter under section 12-21-133 . . . it is immaterial how this constitutional requirement is satisfied so long as it is actually satisfied.

.         .         .

So what I was saying is whether there was one interpreter or a thousand as long as the court in its discretion with that particular person standing there in court determined that this was sufficient,

I think that's all the law requires. In . . . the Turner case there was no interpreter at all. This defendant was arraigned by the judge reading the judge's lips and the court said that is not a violation of due process because from the circumstances the judge determined that he underst[ood] what he told him.

.        .        .

MR. CURENTON:   . . . You were correct on something. There was an oral swab and I believe I misstated. I said that it was negative for my client and positive for Jason Snow. What that actually showed was that the test result for the oral swabs, there were two, showed no seminal fluid present.

THE COURT:          Okay. Thank you for that.

MR. MCGOWIN:      . . . I don't want to waive my previous motion that this issue standing alone is precluded.

THE COURT:          No, your motion to dismiss is under submission.

(*Id.* at 13-15, 16, 17-20, 21-27, 28, 29-30 & 31-32)

19.    On April 16, 2003, the trial court entered an order dismissing a number of other claims raised by Weed in his Rule 32 petition. (Doc. 9, Respondent's Exhibit 5, ORDER of April 16, 2003)

This Court inadvertently overlooked some of the claims in making its ruling set out in this Court's Order dated January 14, 2003. However, Petitioner filed no response to the State's Response and Motion to Dismiss. The State made an oral Motion to Dismiss at the hearing of this matter on February 14, 2003. Petitioner offered no rebuttal to the State's oral Motion to Dismiss other than the fact the Petitioner must raise the claims he has raised in order to file a Federal Habeas petition. This Court continued the hearing of this matter because of notice problems

created by this Court's first Order and because Petitioner raised an Americans With Disabilities Act claim for the first time at the February 14 hearing. Petitioner has had until the date of this Order to respond to both the oral and written motions to dismiss filed by the State.

This Court will follow the form of the State's Response since it is legally and organizationally sound. Furthermore, this Court judicially notices its files and the record as well as its memory. Based upon the above, this Court finds as follows:

### PETITIONER'S CLAIM II.

Petitioner contends that though he was provided an interpreter by this Court, he was denied due process and equal protection.

This constitutional claim, in one form, was raised, heard, and ruled on at trial by this Court prior to Petitioner's plea. *See* Petitioner's Brief, 8-12; trial transcript. It is precluded. Rule 32.2(a)(2). Furthermore, any different argument presented here still could have been raised at trial and is precluded. Rule 32.2(a)(3). The claim is summarily dismissed.

### PETITIONER'S CLAIM III.

Petitioner makes further claims of violations of due process and equal protection.

These constitutional claims could have been raised at trial. They are precluded. Rule 32.2(a)(3). They are summarily dismissed.

### PETITIONER'S CLAIM IV.

Petitioner claims ineffective assistance of trial counsel. He claims:

(A) & (E)      For appeal, counsel did not preserve objection to

43

this Court's ruling on the recusal motion.

This claim will be heard at a later date.

(B)     Counsel waived Petitioner's right to a bifurcated trial without Petitioner's knowledge and waived Petitioner's right to be present at the recusal and discovery hearings.

These claims will be heard at a later date.

(C) & (F)     Counsel did not "sufficiently confer" with Petitioner pre-trial.

This claim will be heard at a later date.

(D)     Counsel ". . . allowed [Petitioner] to enter a plea of guilty to a sexual offense as described above, even though the DNA evidence excluded the Petitioner as the perpetrator of the crime."

This claim is absolutely meritless considering the facts of this case and the record. This claim is denied and dismissed.

(G)     Counsel ". . . did not request the services of Interpreters in a timely manner."

This claim will be heard at a later date.

(H)     Counsel did not challenge the constitutionality of Alabama's laws concerning the appointment of interpreters for the deaf.

This claim has been partially litigated and this Court will hear more on this claim at a later date.

PETITIONER'S CLAIM V.

Finally, Petitioner contends that appellate counsel was ineffective. He claims:

44

(A)     Counsel should have raised the ineffective assistance of trial counsel claims listed in section IV of Petitioner's Brief.

This claim is meritless. Even if counsel could have raised such claims, Petitioner can show no prejudice since ineffective assistance of trial counsel claims may be raised for the first time in a Rule 32 petition, as Petitioner has done here. These claims will be heard and the result may be appealed for review. Petitioner can not meet his burdens under <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052 (1984) and Rule 32.3. This claim is denied and dismissed.

(B)     Counsel should have raised the <u>Brady</u> claim.

This claim is meritless. Counsel did not act unreasonably by failing to raise this claim on appeal. Counsel could not raise this claim since it was waived by the plea of guilty. Furthermore, Petitioner can show no prejudice since the items complained of were produced. Petitioner can not meet his burdens under <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052 (1984) and Rule 32.3. This claim is denied and dismissed.

(C), (D) & (E)         Counsel should have raised the due process and equal protection claims listed in sections II and III of Petitioner's Brief, and should have raised the unconstitutionality of Alabama's "deaf interpreter laws."

These claims are meritless. Counsel did not act unreasonably by failing to raise these claims on appeal. Counsel could not raise these claims since they were waived by the plea of guilty. Also, these substantive claims will be heard and decided incident to the trial counsel claims to be heard at a later date. Petitioner can not meet his burdens under <u>Strickland v. Washington</u>, 466 U.S. 668, 104 S.Ct. 2052 (1984) and Rule 32.3. These claims are denied and dismissed.

<u>CONCLUSION</u>

WHEREFORE, a portion of the claims are hereby

45

> **DENIED** and **DISMISSED** as stated above. The remaining claims
> will be argued orally and/or by brief at a later date to be
> determined by this Court.

(*Id.*)

20.     The trial court reconvened the Rule 32 hearing on September 3,

2003. (Doc. 9, Respondent's Exhibit 5, September 3, 2003 Hearing Transcript,

at 34-112) The opening arguments of Weed's attorney reveals the main bases

of his request for Rule 32 relief. (*Id.* at 39-44)

> MR. CURENTON:     . . . We believe that the brief we have
> submitted and the State and Federal law argued in there is enough
> to prevail on the claim that Mr. Weed was not afforded due
> process by the minimum standards required by A.D.A. and also
> required by the Alabama and United States constitutions as
> interpreted by the courts and we would stand by and rely on the
> cases we've cited. The reason I say this is because at the time of
> the hearing when the jury was being selected, Mr. Weed's
> interpreter, Mr. Godwin in the record, he asked the Court to
> appoint two interpreters for the trial and he informed Your Honor
> that he was an interpreter for the attorney representing Mr. Weed
> and also his services were subject to attorney/client privilege
> because his code of ethics did not allow him to interpret for a
> defendant and his attorney and also interpret for the proceeding
> itself. Mr. White asked the Court to appoint two [more]
> interpreters. That was not done. And it's our position that the
> A.D.A. is the minimum standard that State Courts and Federal
> Courts must follow. That particular aspect of A.D.A. requires that
> the public entity . . . honor the request of the handicapped person
> regarding the accommodation he needs. . . . In this case Mr.
> Weed's attorney and interpreter asked for two [more] interpreters
> to be appointed which was required by the standards that the
> interpreters follow. We believe that that request should have been
> either honored, or . . . at that point the State had the burden . . . to
> demonstrate one of two things, that another equally effective

46

means of communication is available; or two, that use of the means chosen would result in a fundamental alteration of the service, program or activity or an undue financial and administrative burden. The State never did that. There was never any burden of proof shifted to the State to show why the deaf person's request for a particular type of accommodation couldn't be honored. In fact, the Court just denied the request out right and at that point in time when the request was denied and never considered, Mr. Weed was left to attend trial with his attorney and an interpreter who could not interpret the proceedings but only what was privileged between the lawyer and his client.

THE COURT:          . . . You say the request was never considered. In fact, I think the record reveals that Mr. Godwin was allowed time to try to call interpreters to come over either that day or the next day for the trial. Isn't that correct?

MR. CURENTON:      And they could be here the following Monday.

.          .          .

THE COURT:          But you're not considering the effort that was made to try to arrange for another interpreter either that day or the next day.

MR. CURENTON:      That was not Mr. Weed or his interpreter's burden. At the point he made his request as he's allowed to do under the A.D.A. [the] State then had to show why that request could not be accommodated.

THE COURT:          Give me a case that says that.

MR. CURENTON:      It's in the language of the A.D.A. itself.

THE COURT:          Well, I want a case that says it, a case binding on this Court.

47

.     .     .

MR. CURENTON:   . . . The Supreme Court stated [in Katcenbach v. Morgan] . . . that when Congress passes a Federal law or if a state passes a law setting standards higher than the constitution, then those standards become the minimum. . . . We start out with the notion that the constitution of the United States is the minimum . . . protection that citizens receive. But of course any State or the Federal Government can make those standards higher. It's our contention that when Congress passed the A.D.A. it raised the standards . . . for handicapped people. . . . And it's our position that he exercised his rights by asking for the accommodation he needed and it was not provided to him. I think that the State had a burden to show why those minimum standards couldn't be met.

.     .     .

MR. CURENTON:   And my second point is this little remark is that we believe that those forensic reports, you can look at this issue one or two ways. If I'm reading these correctly, Mr. Tyson got a copy of a letter on September 29th with a memorandum attached and that did not give the results. On October 31 the memorandum was prepared giving results excluding Scott Weed and on May 29th it appears from the records I have, that Dr. Riddick certified the documents. Now, if that is the time the D.A. received the D.N.A. evidence, the results of the tests, it was a mere two weeks before trial. . . . If [Mr. White] did know the results, then [he] let Mr. Weed plea[d] to something when he had test results never revealed to Mr. Weed which certainly could have changed his plea. So I think either way you look at it either exculpatory evidence was withheld from Mr. White or he had evidence that was not conveyed to Mr. Weed.

(*Id*. at 39-41, 42, 43-44 & 44-45)

21.     The sole witnesses testifying at the Rule 32 hearing were Weed's

trial attorney, John White, Esquire (*id*. at 47-84 & 96-107), and petitioner's

48

mother, Linda Weed (*id*. at 85-95 & 107-111). White testified, in relevant part, that he communicated with petitioner at the jail through written notes and, in court, through an interpreter (*id*. at 47)[8]; that he reviewed the district attorney's file for the first time shortly after the December 12, 2000 arraignment (*id*. at 50) and that at this point the forensics reports were not attached but he got those reports later (*id*. at 51-53)[9]; that he thoroughly read the forensics reports (*id*. at 55)  and knew substantially what the testimony of Faron Brewer would be at trial (*id*. ("He was going to match the D.N.A. to Mr. Weed as far as the cardboard box was going to go and it was not going to match as far as the swab taken from Ms. Snow.")); that Weed's DNA was not on the two oral swabs (*see id*. at 55 & 57-58) and, therefore, there was no direct DNA evidence supporting the charge of deviate sexual intercourse under Alabama Code § 13A-6-43 (*id*. at 58-59)[10]; that he could have attempted to impeach the victim's testimony with

---

[8]        White could not place a number on the times he visited Weed at the jail but stated that "[i]t was several times." (*Id*. at 47 & 48) White did not need an interpreter for the jail visits because he could successfully communicate with petitioner through written notes. (*See id*. at 72-73)

[9]        White testified that he received the forensics reports a substantial time before trial, inasmuch as he had discussions with the assistant district attorney that the reports were forthcoming. (*Id*. at 53)

[10]        It was clear to White, however, that the victim was going to testify that Weed placed his penis in her mouth. (*Id*. at 61)

the forensics reports (*id*. at 63);[11] that he filed a motion to recuse[12] and waived his client's appearance at the hearing on that motion (*id*. at 68)[13]; that he read the psychological reports and determined from those that Weed was competent (*id*. at 69 & 70), able to understand the proceedings and "knew what was going on[]" (*id*. at 69; *see id*. at 77 (Dr. Chudy informed counsel during a telephone conversation that he was not going to be able to help the defense on the

_____

[11]    The following testimony reveals White's discussions with Weed about the DNA test results:

A    I know I discussed with him about the cardboard box. That was the major stick in the whole case was what she said and the cardboard box, the semen that came back and matched him. That was their case . . . as far as what was left at the scene. Now they had all sorts of things in the car too once they stopped him that went back to the scene like receipts and things of that nature.

Q    For the robbery?

A    But, yes, for purposes of the trial the semen on the box, the cardboard box and her testimony was what we discussed.

(*Id*. at 80)

[12]    White testified that he believed Judge Johnston was "predisposed to make sure [Weed] got prosecuted at the highest level." (*Id*. at 70)

[13]    White testified that the reason he did not reserve the recusal issue for appeal was because once the plea was entered he did not "see any reason to do it." (*Id*. at 71; *see also id*. at 103 (White's testimony that he could not say he consciously decided not to reserve this issue because he was not thinking in terms of reserving or not reserving issues inasmuch as his main interest was "whether Scott was voluntarily going to enter this plea and [he] wanted to make sure [Scott] understood what he was doing . . . The issue of recusal was not even -- we were not even discussing that anymore."))

50

competency issue)); and that he never considered challenging the Alabama method of appointing interpreters (*id*. at 76).[14]   White informed petitioner, prior to entry of his guilty pleas, that the potential sentences for the three Class A felonies he was charged with were consecutive life sentences.[15] (*Id*. at 100 & 101-102)[16]

22.    Linda Weed testified at the Rule 32 hearing that she spoke with White every Friday afternoon after she hired him to represent her son. (*Id*. at

---

[14]    White testified that he never told Weed's mother that the State had  a DNA match to Weed from the victim's body. (*Id*. at 99; *but cf. id.* at 108 (Ms. Weed's testimony that she asked White whether her son's  DNA was on the victim and that White answered in the affirmative and told her that the State "had a match on everything")) According to Ms. Weed, "[j]ust a few minutes before trial started the [DA] gave [White] a thing of papers stapled together which was, I guess, all the evidence or that type of evidence, and it was in there. I did not have an opportunity to closely read it until this ordeal was behind us." (*Id*. at 108) Linda Weed stated that she did not know that "that's the only copy[]" (*id*. at 110; *see also id*. at 111 ("Q And you do not know that Mr. White may not have received a faxed copy of that report prior to trial, do you? A I believe I just said that I didn't -- that I have no way of knowing if that was the only copy or not.")) and that she took the copy the DA gave to White that Monday morning before the jury was struck because White tossed it on the table and "never picked it up when we left for the day[.]" (*Id*. at 110)

[15]    In addition, White testified that he never told Ms. Weed that one jury would decide both her son's competency to stand trial and also the guilt phase of the proceedings. (*Id*. at 99; *but cf. id.* at 91 (Ms. Weed's testimony that White told her the competency trial would be held before the trial on the charges her son faced and that the same jury would be used for both "trials"))

[16]    According to Linda Weed, petitioner was "terrified because he had been repeatedly told that morning that if he did not enter this plea this Judge would give him three consecutive life sentences. . . . It was not presented to him as a possibility. It was presented to him as a fact." (*Id*. at 94)

85) "He would tell me if there had been any new developments. I would relay messages from my son to him. He would tell me what he wanted me to tell Mr. White and then I would tell him." (*Id*. at 85-86) Ms. Weed would also relay messages from White to her son. (*Id*. at 86) According to Weed, her son repeatedly asked her to ask White to visit him at the jail with an interpreter. (*Id*. at 86-87) Ms. Weed testified, moreover, that her son reported to her that White did not visit him at the jail. (*Id*. at 87; *but cf. id*. at 97-98 (White testified that generally speaking he went and saw petitioner at the jail whenever Linda Weed requested that he do so or when he needed to do so)) Weed also testified that she informed White on numerous occasions that her son desired to be present at the recusal hearing and to not waive his presence at the hearing. (*Id*. at 88; *but cf. id*. at 98 ("They never told me I want to definitely be there when it happens but they were very interested in the topic [of recusal], yes, and I had a reason for not having Scott there. . . . Scott was very, very volatile to say the least. When I would talk to him about the fact that Judge Johnston was on the case, he did not want him on the case. And I sincerely thought that if I had any chance of prevailing on my motion to recuse it would be without Scott here because I felt pretty certain Scott was going to have outbursts."))[17]

---

[17]     Weed testified that she told White her son wanted to appeal the recusal ruling the Monday morning before the trial started, that is, before entry of the guilty pleas. (*Id*. at 92-93)

23.    On March 18, 2004, the trial court entered a final order dismissing Weed's Rule 32 petition. (Doc. 9, Respondent's Exhibit 5, March 18, 2004 ORDER)

On September 3, 2003 the court held a hearing on the Petitioner's remaining eight claims concerning the ineffective assistance of counsel. A sign language interpreter was appointed for the hearing and the Petitioner, who is hearing impaired, indicated to the court that he did understand sign language.

Petitioner's primary contention is that he was denied due process by not being granted two interpreters at State expense for trial on the charges, one to interpret the trial proceedings and one to interpret communications between himself and his attorney. Petitioner contends that there are ethical concerns when one interpreter is provided for both the proceedings and the attorney-client discussions.

The court finds that Petitioner's trial attorney went to the jail to meet with the Petitioner at least half a dozen times. He was able to communicate in jail with Petitioner without an interpreter, thus he did not ask for one and did not need one. He met with Petitioner's mother and he met with the Petitioner either before or after those meetings. He communicated with his client by way of written notes and, when in court, through an interpreter. On the date of trial, there was an interpreter in court. He was able to explain matters to the Petitioner and reviewed the State's entire file in preparation for the case. He was provided the DNA results sufficiently in advance of trial, and while they were negative for Petitioner's DNA as to swabs taken from the victim, the forensic tests were positive as to seminal fluid on a piece of cardboard taken from the scene. This evidence was discussed with Petitioner. This evidence was in addition to items seized from the vehicle and to the victim's testimony, with which he was familiar prior to trial.

Petitioner's   mother   testified   that   she   too   relayed

53

information from the Petitioner's attorney to her son and from her son to the attorney. The attorney explained to her that the tests were negative for Petitioner's DNA on swabs taken from the victim, but positive for his semen on the piece of cardboard from the scene.

The attorney had represented the Petitioner previously and had benefit of reports of his competency made both at the time of the earlier representation and in connection with this case and both the psychologist and his attorney were of the opinion that Petitioner was competent. A second psychologist, who had prepared a supplemental report on the question of competency, suggested strongly to the trial attorney that competency would not be an issue and that it would not be helpful to the defense to call him as a witness. So long as there was an interpreter, the Petitioner was able to understand the proceedings and knew what was going on. While the question of Petitioner's competency was therefore not an issue, trial counsel did request that the court provide additional interpreters.

The trial attorney determined that because of his volatile behavior, Petitioner should not be present at a hearing on the motion for recusal of the undersigned. Although interested in it, Petitioner did not insist on being present. Petitioner was aware that the motion to recuse had been denied and had no reservation concerning this issue at the time that he entered his plea of guilty.

The Court concludes that the Petitioner's counsel was not ineffective for not preserving the question of recusal or of Petitioner's presence at the recusal hearing for appeal. No prejudice has been demonstrated in light of the Petitioner's guilty plea. Further, the court finds that Petitioner never indicated his desire to reserve this question for appeal. Nor did he prove to this Court's satisfaction grounds warranting recusal which would have resulted in a favorable result on appeal.

The claim that Petitioner's right to a bifurcated trial was not preserved is without merit as the Petitioner has offered no evidence of incompetency, and has thus failed to show prejudice.

54

The claim that counsel did not sufficiently confer with the Petitioner is unproven, thus without merit.

The claim that counsel allowed the Petitioner to enter a plea of guilty to a sex offense even though the DNA evidence excluded him as the perpetrator is patently without merit. The record establishes that not only was his DNA found in seminal fluid at the scene, but extensive and powerful evidence found in the Petitioner's possession, supported the charges against [] him, including the gun described by the victims and by the Petitioner's mother, which his mother told the police was missing, notes he wrote at the scene of the assault, matching notepaper found in the Petitioner's car, a plastic bag with money taken during the robbery, keys belonging to one of the victims, and the victim's wallet. In addition, the victims had described the robber and assailant as a deaf mute.

The contention that counsel failed to request the services of an interpreter in a timely manner or challenge the constitutionality of local laws concerning the appointment of interpreters is contradicted by the record and, to the extent that it was not raised, waived by the plea of guilty. The Petitioner does not deny that he was provided an interpreter or that he was able to communicate through the interpreter. The record shows that the Court met the requirements under Alabama's Constitution to provide interpretive services. Terry v. State, 21 Ala. App. 100, 105 So. 386 (1925) (right to interpreter is guaranteed under Sec. 6 Ala. Const. which secures to a defendant the right to be heard by himself and counsel, to demand the nature of the accusation, to be confronted by the witnesses against him, and to testify if he elects to do so). See also, Turner v. State, 429 So.2d 645 (Ala. Crim. App. 1982) (no interpreter was provided at arraignment but defendant understood the proceedings, thus no violation of Alabama's Constitution). With respect to guarantees under the U.S. Constitution, "the Supreme Court 'has yet to recognize the right to a court-appointed interpreter as a constitutional one.'" Phillips v. Miller, 2001 U. S. Dist. LEXIS 19793, p. 30 (S.D.N.Y.). Petitioner's contention that he should have been afforded multiple interpreters raises neither a State, nor a Federal

55

Constitutional question. In <u>Phillips v. Miller</u>, the court, citing another decision, recognized that "the Constitution does not guarantee every defendant a perfect trial." <u>Id</u>., at 34. So long as the court in its discretion took reasonable measures to accommodate the Petitioner's disability, the Petitioner's rights were not violated. <u>People v. Williams</u>, 771 N.E.2d 1095, 1099 (Ill. App. 2002) (confrontation clause requires that reasonable measures be taken to accommodate the disability); <u>Shook v. State</u>, 2000 U.S. Dist. LEXIS 8851 p.18 (N.D. Miss.); <u>Meaders v. Carroll</u>, 1993 U.S. App. LEXIS 25899, p. 3 (9th Cir.) ("[a]s a [U.S.] constitutional matter, the appointment of interpreters is within the trial court's discretion"). Finally, the costs associated with providing interpretive services is also a consideration. <u>Baker v. Louisiana</u>, 1992 U.S. Dist. LEXIS 21599, p. 10 (W.D. La.) (state court procedures insuring that interpretive services be provided to defendants at a minimum cost to the public should be afforded great respect). The Petitioner's contentions, especially the claim that the Americans With Disabilities Act's (2 U.S.C. Sec. 12131-12161) standards require that his conviction be set aside do not raise a cognizable issue under Rule 32 and are unfounded in law and fact.

The claim that appellate counsel failed to challenge trial counsel's effectiveness is likewise without merit. Inasmuch as the claims of trial counsel are raised in the instant petition, no prejudice has been shown.

The claim that appellate counsel should have raised the *Brady* claim (that the State failed to disclose exculpatory evidence -- i.e. the DNA results discussed above) is without merit inasmuch as the claim is waived by the plea of guilty and is substantively without merit. The evidence was not only produced, but viewed in toto, can hardly be considered exculpatory.

Accordingly, the petition is dismissed for failure [to] plead a right to relief, Rule 32.3, failure to state a claim, Rule 32.7(d), and for having raised no material issue of fact or law[,] Rule 32.7(d).

56

(*Id.*)

24.    Weed filed written notice of appeal from the denial of his Rule 32 petition on April 6, 2004. (Doc. 9, Respondent's Exhibit 5, NOTICE OF APPEAL) In his appellate brief, petitioner raised the following five issues for consideration by the Alabama Court of Criminal Appeals: (1) the State of Alabama withheld exculpatory evidence in violation of *Brady v. Maryland*; (2) the trial court's failure to grant him sufficient funds for additional interpreters denied him due process and equal protection of the laws; (3) the trial court committed reversible error by denying his due process and equal protection claim since he was denied his right to know the evidence, denied sufficient time to evaluate the evidence, and denied the right to assist in his defense as a consequence of being denied sufficient funds for interpreters and on account of the state withholding exculpatory evidence regarding the DNA test results; (4) the trial court committed reversible error by denying his ineffective assistance of trial counsel claim inasmuch as said performance was deficient and outside the range of professionally competent assistance and he was prejudiced by the deficient performance; and (5) the trial court committed reversible error by denying his claim of ineffective assistance of appellate counsel inasmuch as said performance was deficient and his deficient performance caused him prejudice. (Doc. 8, Respondent's Exhibit 6, at 6; *see also* Doc. 16, Exhibit A)

57

25.   The Alabama Court of Criminal Appeals affirmed the trial court's judgment denying Weed's Rule 32 petition by memorandum opinion entered on August 27, 2004. (Doc. 8, Respondent's Exhibit 8)

On December 24, 2002, Weed filed the instant Rule 32 petition, wherein he claimed: (1) that the State violated the mandates of Brady v. Maryland, 373 U.S. 83 (1963), based on its failure to produce or make available to him any and all exculpatory evidence, specifically, the results of DNA tests or examinations which would be used against him at trial; (2) that his due process rights and guarantee of equal protection under the law were violated because the trial court failed to grant him sufficient funds for interpreters; (3) that his due process rights and guarantee of equal protection were violated because he had a right to know the evidence against him and to know that evidence in sufficient time for his counsel to evaluate the evidence to be used against him; (4) that he was denied effective assistance of trial counsel; and (5) that he was denied effective assistance of appellate counsel. The State filed a response to Weed's claims and a motion to dismiss.

On January 14, 2003, the circuit court entered an order denying relief as to Weed's Brady claim. The Court ruled that the claim was precluded from review because it could have been raised at trial as required by Rule 32.2(a)(3), Ala. R. Crim. P. The Court further ruled that Weed waived this claim when he entered his guilty plea. In addition, the circuit court found that the Brady claim was without merit because the State had an "open file" discovery policy and Weed's counsel could have made an appointment to review all of the forensic evidence. The court then set the remainder of Weed's claims for a hearing and oral argument at a later date.

On April 16, 2003, the circuit court entered rulings on additional procedurally barred claims which it had overlooked at the time the January 14, 2003, order was issued. The court ruled that Weed's claim that he was denied due process and equal

protection because he was not provided with additional interpreters was precluded from review pursuant to Rule 32.2(a)(2), because the claim was raised and heard at trial before Weed entered his plea. The court ruled that Weed's additional claims of violations of due process and equal protection were precluded under Rule 32.2(a)(3) because they could have been raised at trial. The court further ruled that Weed's claim that his appellate counsel was ineffective because he failed to raise the claim of ineffective assistance of trial counsel on appeal was without merit because Weed suffered no prejudice. The court ruled that Weed could properly raise the ineffective assistance of trial counsel claim for the first time in a Rule 32 petition, as in the instant case. The court found that Weed's claim that his appellate counsel should have raised the <u>Brady</u> claim on appeal was without merit because the claim was waived when Weed entered his guilty plea. The court also found that Weed's appellate counsel was not ineffective for failure to raise the due process and equal protection claims listed in sections (2) and (3) of his petition, and was not ineffective for failure to raise the unconstitutionality of the State of Alabama's deaf interpreter laws, because these claims were also waived by the entry of the guilty plea. Finally, the court ruled that the substantive claims would be heard and decided as part of the ineffective assistance of trial counsel claims that were set for oral argument.

On September 3, 2003, the circuit court held a hearing where evidence was presented in support of Weed's eight remaining claims of ineffective assistance of counsel. On March 18, 2004, the circuit court entered its final order on Weed's petition. In that order, the court found that Weed's trial attorney met with Weed at least six times. The court found that Weed was able to communicate with his attorney without an interpreter, and that Weed's mother also relayed information from counsel to Weed and from Weed to his attorney. The court found that the interpreter that was provided to Weed was able to adequately explain the trial proceedings to Weed. Further, it found that, even though Weed's DNA was not found on any of the swabs taken from the victim, his DNA was present in the seminal fluid that was found on a piece of cardboard at the crime scene. The court

found that this evidence, along with additional evidence seized from Weed's vehicle, was known to Weed before the entry of his guilty plea. The trial court found that Weed's competency to stand trial was not at issue at trial because a psychologist, who had prepared a supplemental report on Weed's competency, suggested that Weed was competent to stand trial. The trial court found that trial counsel did request additional funds to obtain additional interpreters for trial, however his request was denied.

The trial court found that Weed was aware of the hearing setting on his motion for recusal, but did not insist on being present. The court found that the trial attorney had expressly not wanted Weed to be present at the hearing because of his unpredictable and volatile behavior. The court found that Weed was aware that the motion to recuse was denied at the time he entered his guilty plea. Further, the trial court found that counsel was not ineffective for failure to preserve for appeal the issue of recusal, or Weed's absence from the recusal hearing. The court found that Weed had demonstrated no prejudice and further found that Weed did not indicate a desire to reserve those particular issues for appeal. The court also found that, in any event, Weed was not likely to obtain relief on these claims even if he had preserved them for appellate review.

The trial court found that trial counsel was not ineffective for failure to preserve Weed's right to a bifurcated trial because Weed presented no evidence of incompetency. Thus, Weed failed to show that he suffered prejudice by counsel's failure to preserve the claim.

The trial court denied relief on Weed's claim that trial counsel allowed him to enter a guilty plea to a sex offense even though the DNA evidence excluded him as the perpetrator of the crime. The trial court found that the presence of Weed's DNA in seminal fluid found at the scene of the crime, together with other extensive material evidence, including the victims' description of Weed as the perpetrator, supported the charges against him.

The court also found that Weed's claims that his trial

60

counsel failed to request the services of an interpreter in a timely fashion and failed to challenge the constitutionality of laws concerning appointment of interpreters were waived when Weed entered his guilty plea. Additionally, the court found that the claims were without merit. The court denied Weed's claim that the Americans With Disabilities Act required that his convictions be set aside because the claim did not recognize a cognizable issue under Rule 32, Ala. R. Crim. P.

The court denied Weed's claim that appellate counsel was ineffective because counsel failed to raise on appeal a claim that trial counsel was ineffective because the ineffective assistance of trial counsel claim was cognizable under Rule 32 and raised in this petition. The trial court also found that appellate counsel was not ineffective for failing to raise the <u>Brady</u> claim because that claim was waived when Weed entered his plea. This appeal followed.

## I.

On appeal, Weed contends that the trial court erred when it denied relief as to his claim that the State withheld exculpatory evidence. Specifically, Weed claims that the State failed to produce the results of forensic examinations that showed his DNA was not present on oral swabs taken from the victim, and that no seminal fluid was found on vaginal swabs taken from the victim.

We note that the specific claim he now raises on appeal is based on newly discovered evidence. In his petition, however, Weed raised the claim as a substantive <u>Brady</u> claim, claiming that the State had failed to disclose the evidence. Because he did not assert the newly-discovered evidence claim at the trial court level, this claim is not properly before this Court for review. See <u>Kaska v. State</u>, 740 So.2d 475, 477 (Ala. Crim. App. 1998) ("an appellant cannot raise issues on appeal from the denial of a Rule 32 petition that were not raised in the original petition").

Moreover, Weed waived the claim because he pleaded

guilty. It is well settled law that "by pleading guilty, a defendant waives all nonjurisdictional defects occurring before the plea." Spears v. State, 647 So.2d 15, 20 (Ala. Crim. App. 1994) (citing Martin v. State, 579 So.2d 69, 70 (Ala. Crim. App. 1991)). A defendant who wishes to appeal an adverse ruling on an issue raised prior to the entry of the plea must inform the trial court, at the time the plea is entered, that he intends to reserve the issue on appeal. Spears, 647 So.2d at 21.

Moreover, the trial court correctly denied relief as to this claim because it determined that no Brady violation had been committed. At the Rule 32 hearing, defense counsel testified that he viewed the State's file after the arraignment and obtained copies of the documents. He also admitted that he received copies of the forensic documents in a substantial period of time before the date of the trial. He understood that the results of the DNA tests revealed that Weed was a match for the seminal fluid found on a piece of cardboard and not for the DNA found on the swabs taken from the victim. That knowledge could be imputed to Weed and he had the option of reviewing the file at any time before trial. The trial court properly denied relief as to this claim. See Boyd v. State, [Ms. CR-02-0037 September 26, 2003] ____ So.2d ___ (Ala. Crim. App. 2003).

## II.

Next, Weed argues that the trial court's refusal to grant him sufficient funds with which to hire additional interpreters denied his rights to due process and equal protection. He also contends that the denial constitutes a violation of the Americans With Disabilities Act and applicable Alabama law.

As stated herein, "by pleading guilty, a defendant waives all nonjurisdictional defects occurring before the plea." Spears v. State, 647 So.2d 15, 20 (Ala. Crim. App. 1994) (citing Martin v. State, 579 So.2d 69, 70 (Ala. Crim. App. 1991)). Also, this claim was properly denied by the trial court because it was raised and addressed at trial before the entry of Weed's guilty plea. Thus it was properly precluded from review pursuant to Rule 32.2(a)(2),

62

Ala. R. Crim.P.

### III.

Weed also claims that the trial court's refusal to grant him sufficient funds for interpreters denied him the right to have sufficient time to evaluate the evidence against him and to evaluate the evidence to assist in his own defense. Again, this nonjurisdictional claim was waived by the entry of his guilty plea. The trial court properly denied this claim. See Spears v. State, supra.

### IV.

Weed challenges the trial court's denial of his claims of ineffective assistance of trial counsel. He alleges several specific grounds in support of his claims: (1) counsel failed to reserve the right to appeal the recusal issue; (2) counsel waived Weed's right to a bifurcated trial on the issue of competency without Weed's knowledge and further waived Weed's right to be at the recusal hearing; (3) counsel did not sufficiently confer with Weed before trial because an interpreter wasn't present; (4) counsel allowed Weed to enter a plea of guilty even though the DNA evidence indicated Weed could not have committed the crime; (5) counsel failed to object or reserve for appeal Weed's right to have his criminal prosecutions assigned by a judge by the usual lottery system of docket assignments utilized by the Mobile Circuit Court; (6) counsel did not confer with Weed at any location away from the courthouse, nor did he object to his inability to confer with Weed away from the courthouse[], nor did he reserve the issue for appeal; (7) counsel did not request the services of additional interpreters in a timely fashion; and (8) counsel did not challenge the constitutionality of Alabama law regarding the appointment of interpreters for deaf mutes in criminal proceedings and/or its failure to satisfy constitutional requirements.

We hold that the trial court did not err when it denied Weed's claims that his counsel rendered ineffective assistance.

Weed has not met his burden of showing that counsel committed errors so serious as to deprive him of a fair trial, or that those alleged errors affected the outcome of his case.

It is well established that, to prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) that his counsel's performance was deficient, and (2) that he was prejudiced by the deficient performance. Strickland v. Washington, 466 U.S. 668, 687 (1984); Ex parte Lawley, 512 So.2d 1370, 1372 (Ala. 1987). "The performance component outlined in Strickland is an objective one: that is, whether counsel's assistance, judged under 'prevailing professional norms,' was 'reasonable considering all the circumstances.'" Daniels v. State, 650 So.2d 544, 552 (Ala. Crim. App. 1994), cert. denied, 488 U.S. 1051 (1995) (quoting Strickland, 466 U.S. at 688). "A court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690. In a Rule 32 proceeding, the petitioner had "the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." Rule 32.3, Ala. R. Crim. P. See Fortenberry v. State, 659 So.2d 194 (Ala. Crim. App. 1994), cert. denied, 516 U.S. 846 (1995); Elliott v. State, 601 So.2d 1118 (Ala. Crim. App. 1992).

When reviewing a claim of ineffective assistance of counsel, this Court indulges a strong presumption that counsel's conduct was appropriate and reasonable. Hallford v. State, 629 So.2d 6 (Ala. Crim. app. 1992); Luke v. State, 484 So.2d 531 (Ala. Crim. App. 1985).

None of Weed's allegations are sufficient to show that Weed's counsel's performance fell outside of the wide range of professionally competent assistance, nor has he met his burden of showing that he would not have been convicted if counsel had done all the things that he alleges should have been done. Therefore, the trial court properly denied relief as to this claim.

Weed has not shown that he would have obtained relief as to the issue of recusal on appeal if it had been properly preserved for appellate review. He has not shown that he was prejudiced by the waiver of the bifurcated trial regarding his competency to stand trial because he cannot show that he would have been declared legally incompetent. He has not shown that counsel's failure to confer with him more frequently about his case prejudiced his defense. Nor has he shown that he had additional information to impart to counsel that he would have shared if counsel had met with him more frequently. It was not ineffective assistance of trial counsel not to pursue the issue of additional interpreters because the issue was raised and was denied by the trial court. Failure to preserve the claim for appellate review does not constitute professional error because, even if this issue had been preserved, he would have obtained no relief on appeal.

It was not legal error for trial counsel to allow Weed to plead guilty after realizing that some forensic evidence obtained from the victim did not indicate the presence of Weed's DNA, because other inculpatory evidence existed, including other evidence indicating that Weed's DNA was found at the crime scene, and the testimony of the victims that would have been used to prove Weed's guilt. He has not shown that the judge who heard his case was biased against him; thus, his claim that he was prejudiced because his case was not assigned through the lottery system is without merit. He has not shown that meeting with his trial counsel at the courthouse rather than another location would have changed the outcome of his case, or that doing so constituted professional error; therefore, failure to preserve the issue for appellate review does not constitute ineffective assistance of counsel.

Based on all of the above, we affirm the trial court's ruling that trial counsel did not render ineffective assistance.

## V.

Finally, Weed contends that his appellate counsel rendered ineffective assistance. Specifically, he alleges that appellate

counsel was ineffective for the following reasons: (1) counsel failed to raise the issue of ineffective assistance of trial on appeal; (2) counsel failed to raise the Brady issue on appeal; (3) counsel failed to raise the due process violation and the issue of equal protection as described in claim (2) on appeal; (4) counsel failed to raise the issue of Weed's denial of the right to assist in his defense, the right to know the evidence, the right to evaluate the evidence as a result of being denied sufficient funds to hire interpreters and the withholding of exculpatory evidence; and (5) counsel failed to raise the alleged unconstitutionality of Alabama's law regarding the appointment of interpreters for hearing-impaired defendants and the law's failure to meet constitutional standards.

As stated herein in Section IV, to prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that his counsel's performance was deficient, and (2) that he was prejudiced by the deficient performance. Strickland v. Washington, 466 U.S. 668 (1984). The standards for determining whether appellate counsel was ineffective are the same as those for determining whether trial counsel was ineffective. Ex parte Dunn, 514 So.2d 1300, 1303 (Ala. 1987).

We note that Weed did not raise the ineffective assistance of trial counsel claims at the trial court level; thus they were not preserved for review by this Court on direct appeal. Because ineffective assistance of trial counsel claims were not preserved for appellate review, Weed's appellate counsel was not ineffective for not challenging trial counsel's performance on direct appeal. Alderman v. State, 647 So.2d 28, 31 (Ala. Crim. App. 1994). Counsel cannot be ineffective for failing to raise a meritless issue. See Patrick v. State, 680 So.2d 959, 963 (Ala. Crim. App. 1996); Hope v. State, 521 So.2d 1383, 1386 (Ala. Crim. App. 1988). Moreover, because Weed could still raise all of his ineffective-assistance-of-trial-counsel claims in a Rule 32 petition, he suffered no prejudice as a result of appellate counsel's decision not to raise this issue on direct appeal. Thus, Weed has not met the requirements set forth in Strickland to establish that appellate counsel was ineffective.

66

The standard of review in evaluating the denial of a Rule 32 petition is whether the trial court abused its discretion. Elliot v. State, 601 So.2d 1118, 1119 (Ala. Crim. App. 1992). The trial court's findings are supported by the record. Accordingly, the judgment of the trial court denying Weed's petition is affirmed.

(*Id*. at 2-10)

26.     Weed's application for rehearing was denied by the Alabama Court of Criminal Appeals on September 17, 2004 and his petition for writ of certiorari to the Alabama Supreme Court was denied on January 7, 2005. (*See* Doc. 6, Respondent's ANSWER, at 3)

## CONCLUSIONS OF LAW

### A.     Procedural Default.

1.       In *Coleman v. Thompson*, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), the Supreme Court stated that it would "not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Id.* at 729, 111 S.Ct. at 2553-2554.  This rule applies whether the state law ground is procedural or substantive.  *Id.* at 729, 111 S.Ct. at 2554.  The doctrine applies to bar federal habeas review when a state court declines to address a petitioner's federal claims because the petitioner fails to meet a state procedural requirement. *Id.* at 729-730, 111 S.Ct. at 2554; *see also Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977)

(federal courts must honor legitimate state trial and appellate procedural rules when enforced by state courts and must decline to review on the merits claims that the state treats as barred absent a showing of cause for non-compliance with such rules and resulting prejudice); *Alderman v. Zant*, 22 F.3d 1541, 1549 (11th Cir.) ("Pursuant to the doctrine of procedural default, a state prisoner seeking federal habeas corpus relief, who fails to raise his federal constitution[al] claim in state court, or who attempts to raise it in a manner not permitted by state procedural rules is barred from pursuing the same claim in federal court absent a showing of cause for and actual prejudice from the default."), *cert. denied sub nom. Alderman v. Thomas*, 513 U.S.1061, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994). "In these cases, the state judgment rests on independent and adequate state procedural grounds."  *Coleman*, 501 U.S. at 730, 111 S.Ct. at 2554 (citations omitted).

      2.       The application of the independent and adequate state ground doctrine in the habeas context is grounded in concerns of federalism and comity. *Id.*

> Without the rule, a federal district court would be able to do in habeas what this Court could not do on direct review; habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws.

*Id.* at 730-731, 111 S.Ct. at 2554.

3.     An additional consideration comes to the fore when the independent and adequate state ground supporting a petitioner's custody is a state procedural default.  *Id*. at 731, 111 S.Ct. at 2554.  The Supreme Court has long held

> that a state prisoner's federal habeas petition should be dismissed if the prisoner has not exhausted available state remedies as to any of his federal claims.  (citations omitted)    This exhaustion requirement is also grounded in principles of comity; in a federal system, the States should have the opportunity to address and correct alleged violations of state prisoners' federal rights.
>
>      . . .
>
> [A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance.  A habeas petitioner who has defaulted his federal claims in state court meets the technical requirement for exhaustion; there are no state remedies any longer "available" to him.  (citations omitted)    In the absence of the independent and adequate state ground doctrine in federal habeas, habeas petitioners would be able to avoid the exhaustion requirement by defaulting their federal claims in state court.    The independent and adequate state ground doctrine ensures that the States' interest in correcting their own mistakes is respected in all federal habeas cases.

*Id.* at 731, 732, 111 S.Ct. at 2554-2555, 2555.

4.      In the habeas context, federal courts are to "presume that there is no independent and adequate state ground for a state court decision when the decision 'fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion.'"  *Id.* at 735, 111 S.Ct. at 2557 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-1041, 103 S.Ct. 3469, 3476-3477, 77 L.Ed.2d 1201 (1983)); *see Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989) ("[A] procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar.").   In all other cases, the presumption is not applicable.  *See Coleman*, 501 U.S. at 739, 111 S.Ct. at 2559.  In *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), the Supreme Court held that the *Harris v. Reed* presumption is inapplicable to a claim that is never presented to the state courts.  *Id.* at 299, 109 S.Ct. at 1069 ("The rule announced in *Harris v. Reed* assumes that a state court has had the opportunity to address a claim that is later raised in a federal habeas proceeding.").   Moreover, the presumption "looks through" unexplained orders to the last reasoned decision.  *Ylst v. Nunnemaker*, 501 U.S. 797, 804,

111 S.Ct. 2590, 2595, 115 L.Ed.2d 706 (1991).

> Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground.  If an earlier opinion "fairly appear[s] to rest primarily upon federal law," *Coleman*,[__ U.S., at __, 111 S.Ct., at 2559], we will presume that no procedural default has been invoked by a subsequent unexplained order that leaves the judgment or its consequences in place.  Similarly where . . . the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.

501 U.S. at 803, 111 S.Ct. at 2594.  Also, the presumption may not be applied in cases in which the state court opinion did not, at a minimum, discuss the federal grounds at issue."  *Tower v. Phillips*, 7 F.3d 206, 211 (11th Cir. 1993) ("*Coleman* and *Ylst* lead us to conclude that we may not assume that had the state court issued an opinion, it would have ignored its own procedural rules and reached the merits of this case. In fact, the most reasonable assumption is that had the state court ruled, it would have enforced the procedural bar.").  Finally, "where a state court has ruled in the alternative, addressing both the independent state procedural ground and the merits of the federal claim, the federal court should apply the state procedural bar and decline to reach the merits of the claim." *Alderman v. Zant, supra*, 22 F.3d at 1549.

5.     When a petitioner has procedurally defaulted a claim, a federal court is barred from reaching the merits of that claim unless the petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[] will result in a fundamental miscarriage of justice."  *Coleman, supra*, 501 U.S. at 750, 111 S.Ct. at 2565.  The cause and prejudice standard applies "uniformly to all independent and adequate state procedural defaults."  *Id.* at 750-751, 111 S.Ct. at 2565.

> In procedural default cases, the cause standard requires the petitioner to show that "some objective factor external to the defense impeded counsel's efforts" to raise the claim in state court. (citation omitted).    Objective factors that constitute cause include "'interference by officials'" that makes compliance with the state's procedural rule impracticable, and "a showing that the factual or legal basis for a claim was not reasonably available to counsel." (citation omitted).    In addition, constitutionally "[i]neffective assistance of counsel . . . is cause." (citation omitted).    Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default. (citation omitted).   Once the petitioner has established cause, he must show "'actual prejudice' resulting from the errors of which he complains." (citation omitted).

> Federal courts retain the authority to issue the writ of habeas corpus in a further, narrow class of cases despite a petitioner's failure to show

> cause for a procedural default. These are
> extraordinary instances when a constitutional
> violation probably has caused the conviction of one
> innocent of the crime. We have described this
> class of cases as implicating a fundamental
> miscarriage of justice. (citation omitted).

*McCleskey v. Zant*, 499 U.S. 467, 493-494, 111 S.Ct. 1454, 1470, 113 L.Ed.2d

517 (1991).

6. Respondent contends that this Court is procedurally barred from

reaching the merits of the first three claims raised in the instant petition.

Specifically, respondent contends that petitioner's *Brady* violation claim has

been defaulted both because the alleged violation occurred prior to entry of the

guilty pleas thereby resulting in waiver of the claim and also because he raised

this claim as a newly-discovered-evidence claim in the Alabama Court of

Criminal Appeals rather than a substantive *Brady* claim. In addition, respondent

contends that claims two and three raised in the instant petition have been

procedurally defaulted because both claims were waived with entry of the guilty

pleas. Although this Court disagrees with the conclusion of the Alabama Court

of Criminal Appeals that Weed failed to raise a substantive *Brady* claim on

appeal, it agrees with the Alabama appellate court that these three claims were

indeed waived by petitioner with entry of the guilty pleas. *See Tollett v.*

*Henderson,* 411 U.S. 258, 267, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235 (1973)

("[A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea."); *Stanley v. Wainwright*, 604 F.2d 379, 380 n.1 (5th Cir. 1979) ("Normally a plea of guilty or nolo contendere, if intelligently and voluntarily made, prevents a defendant from raising in a habeas corpus proceeding claims of constitutional violations relating to events that occurred prior to the entry of the plea."), *cert. denied*, 447 U.S. 925, 100 S.Ct. 3019, 65 L.Ed.2d 1118 (1980); *cf. Horace v. Wainwright*, 781 F.2d 1558, 1565 (11th Cir. 1986) (indicating only that a petitioner cannot be barred by the procedural default rule from raising claims of incompetency to stand trial, insanity at the time of the act, and unknowing and involuntary guilty plea), *cert. denied*, 479 U.S. 869, 107 S.Ct. 235, 93 L.Ed.2d 160 (1986). While petitioner makes the argument, with respect to the first and third claim, that he did not appreciate the nature of the evidence against him and necessarily could not enter a voluntary and knowing plea to the sodomy charge, the Court finds this argument specious in light of the evidence of record. However, in order to reach this conclusion, the undersigned need address the merits of these two claims. Those merits will be reached within the context of

a discussion of the cause and prejudice and actual innocence exceptions to the procedural default doctrine since the undersigned must address those standards in relation to the second claim which the respondent claims is procedurally barred.

7.     Petitioner contends that constitutionally ineffective assistance of counsel and interference by state officials constitute cause for any procedural default of his *Brady* claim and his claim that he was denied due process and equal protection of the laws because he was denied his right to know the evidence, evaluate that evidence and denied the right to assist in his defense by being deprived sufficient funds for interpreters and by the State withholding exculpatory DNA evidence. The undersigned finds that there was no interference by state officials inasmuch as Weed's trial attorney unequivocally testified that he received the DNA test results well in advance of trial and that he informed the petitioner that the State was going to be able to match his DNA to the scene, his semen being on the cardboard box, and that the victim was going to testify that petitioner placed his penis in her mouth. More importantly, petitioner's trial attorney, John White, was not deficient in failing to raise these issues on appeal inasmuch as there was no *Brady* violation.[18]   Inasmuch as there was no *Brady*

---

[18]     In *Brady*, *supra*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material

violation, petitioner can establish neither that his guilty plea to the sodomy

charge was involuntarily and unknowingly entered nor cause for his procedural

default of these issues.[19]

        8.      With respect to petitioner's ADA-related claim that the trial court

refused to grant Weed sufficient funds for interpreters to ensure that he receive

---

either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196-1197. In order to establish a *Brady* violation, a petitioner must establish these three elements: "(1) suppression by the prosecution; (2) of exculpatory evidence; (3) material to the issues at trial or sentencing." *Kennedy v. Herring*, 54 F.3d 678, 682 (11th Cir. 1995) (citation omitted).

> The third element is satisfied "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."

*Id.*, quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985).

      In this case, petitioner has failed to establish that the prosecution suppressed evidence inasmuch as it is clear from defense counsel's Rule 32 hearing testimony that the forensic test results were disclosed to him well in advance of trial. Moreover, the evidence is simply not exculpatory or of the nature that would necessarily impeach the victim's testimony, *cf. Breedlove v. Moore*, 279 F.3d 952, 961 (11th Cir. 2002) ("The duty to disclose covers both exculpatory evidence and evidence tending to impeach a state witness."), *cert. denied sub nom. Breedlove v. Crosby*, 537 U.S. 1204, 123 S.Ct. 1278, 154 L.Ed.2d 1047 (2003). Simply because Weed's DNA was not found on the oral swabs does not establish that petitioner did not place his penis in Shannon Snow's mouth nor is it evidence which would impeach the victim's testimony that Weed placed his penis in her mouth.

      [19]     As reflected more fully in the Court's consideration of petitioner's ineffective assistance of appellate counsel claims, because the State of Alabama did not withhold exculpatory evidence and the trial court did not deny Weed sufficient funds for interpreters, Weed and his attorney were well aware of the evidence against him and petitioner was well capable of participating in his defense. Accordingly, his third basis for habeas relief has no merit.

the same due process and equal protection guarantees afforded non-deaf persons, the cause argument made is that this is a unique constitutional claim that had not been decided at the time the guilty pleas were entered. Even assuming petitioner's argument establishes cause for the procedural default of this claim, *see Reed v. Ross*, 468 U.S. 1, 16, 104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984) ("[W]here a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable state procedures."), he cannot establish prejudice  inasmuch as it is the undersigned's opinion that the only way to show prejudice in this regard is for petitioner to have gone through his entire trial without  a sufficient number of interpreters such that he was denied due process of law and equal protection of the laws. In this case, the record makes clear that the trial court took a half-day break, after the jury was struck, to enable defense counsel to procure another interpreter to aid in the orderly process of Weed's trial. The record reveals that the following day, instead of proceeding to trial with only one interpreter, petitioner entered counseled guilty pleas to first-degree robbery and first-degree sodomy. Inasmuch as there is no indication of a problem in one interpreter handling the guilty plea proceeding, petitioner simply has no basis to assert a due process and equal protection violation in this regard.

9.     The fundamental miscarriage of justice/actual innocence exception does not apply in this case because petitioner has not satisfied the standard set forth in *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).  That standard requires Weed to show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id*. at 496, 106 S.Ct. at 2649-2650.  To be credible, a claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." *Schlup v. Delo,* 513 U.S. 298, 324, 115 S.Ct. 851, 865, 130 L.Ed.2d 808 (1995); *see also id.* at 327, 115 S.Ct. at 867 ("To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."). Weed has not come forward with any evidence which establishes his actual innocence and thereby undermines his guilty pleas to first-degree

robbery[20] and first-degree sodomy.[21] Accordingly, this case is not one of those rare cases in which the actual innocence exception is applicable.

## B.    Merits of the Ineffective Assistance of Counsel Claims.

10.    Weed filed his petition for writ of habeas corpus relief in this Court on January 11, 2005, and therefore, his case is governed by 28 U.S.C. §

---

[20]    Petitioner makes no argument that he is actually innocent of first-degree robbery. (*See* Doc. 12, at 19-20 ("Weed contends the evidence shows his innocence of the sex crime to which he entered a plea of guilty, and that his claim of innocence provides 'a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'"))

[21]    Stated differently, viewing all of the evidence proffered at petitioner's guilty plea proceeding in the light most favorable to the prosecution, the undersigned is of the opinion that any rational trier of fact could have found the essential elements of first-degree sodomy beyond a reasonable doubt if this case had gone to trial and, therefore, the facts of this case do not support a conclusion that there will be a fundamental miscarriage of justice if this Court does not consider the federal claims raised in the instant petition. *See Murray v. Carrier, supra*, 477 U.S. at 496, 106 S.Ct. at 2649.

Under Alabama law, a person commits the crime of first-degree sodomy if "[h]e engages in deviate sexual intercourse with another person by forcible compulsion[.]" Ala.Code § 13A-6-63(a)(1). "Deviate sexual intercourse is defined as 'any act of sexual gratification between persons not married to each other, involving the sex organs of one person and the mouth or anus of another.'" *Chandler v. State*, 555 So.2d 1138, 1140 (Ala.Crim.App. 1989), quoting Ala.Code § 13A-6-60(2). Moreover, "[t]he testimony of the victim alone is sufficient to establish the element of forcible compulsion[,]" *Sartin v. State*, 615 So.2d 135, 137 (Ala.Crim.App.1992) (citation omitted), and there is no requirement that emission is an element of the crime or that the perpetrator's DNA be present in the mouth of the victim, *see id*. (no DNA evidence presented at trial; "the victim's testimony that the appellant held a knife to her neck and forced her to have both oral and vaginal sex with him was sufficient to support the jury's verdict[]"); *cf. Perry v. State*, 568 So.2d 873, 876 (Ala.Crim.App. 1990) ("'[T]he absence of semen or hair samples does not necessarily prove that sexual intercourse did not take place.'"). Given the State's proffer that the victim would testify that Weed, while armed with a pistol, forced her to perform oral sex on him, it is clear to the undersigned that petitioner cannot establish that he is actually innocent of the first-degree sodomy of Ms. Snow.

2254 as amended by the Antiterrorism and Effective Death Penalty Act (AEDPA). *Williams v. Taylor*, 529 U.S. 362, 402, 120 S.Ct. 1495, 1518, 146 L.Ed.2d 389 (2000); *Bottoson v. Moore*, 234 F.3d 526, 530 (11th Cir. 2000), *cert. denied*, 534 U.S. 956, 122 S.Ct. 357, 151 L.Ed.2d 270 (2001). As amended, § 2254 now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) & (2) (footnote added).  Moreover, the Act, as amended, presumes as correct all determinations of factual issues made by a State court and places the burden upon the petitioner of rebutting such a presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e); *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001) ("[A] state court's factual findings are presumed correct, unless rebutted by the petitioner with clear and convincing evidence."), *cert. denied*, 537 U.S. 870, 123 S.Ct. 278, 154 L.Ed.2d

119 (2002).[22]

11.    In *Williams v. Taylor, supra*, the Supreme Court held that

§ 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.   Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied— the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."   Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.[23]   Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

_____

[22]    Based upon the facts as found by the Circuit Court of Mobile County, Alabama and the Alabama Court of Criminal Appeals in their pertinent decisions, it is clear that no argument can be made that the decisions of those courts were based upon unreasonable determinations of the facts in light of the contents of the record.   More to the point, since this Court must presume as correct the determinations of all factual issues made by the Alabama courts, petitioner simply cannot rebut that presumption of correctness by clear and convincing evidence. *See Putman, supra*, 268 F.3d at 1241 ("Appellant does not dispute the factual findings of the Georgia courts. Therefore, neither § 2254(d)(2) nor § 2254(e)(1) is relevant to our inquiry.").

[23]    "Avoiding these pitfalls does not require citation of our cases--indeed, it does not even require *awareness* of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S.Ct. 362, 365, 154 L.Ed.2d 263 (2002).

*Id.* at 412-413, 120 S.Ct. at 1523 (footnote added); *see also Neelley v. Nagle*, 138 F.3d 917, 924-925 (11th Cir. 1998) ("[A] court evaluating a habeas petition under § 2254(d)(1) must engage in a three-step process: First, the court must 'survey the legal landscape,' . . . to ascertain the federal law applicable to the petitioner's claim that is 'clearly established' by the Supreme Court at the time of the state court's adjudication. Second, the court must determine whether the state court adjudication was contrary to the clearly established Supreme Court case law, either because the state court failed to apply the proper Supreme Court precedent, or because the state court reached a different conclusion based on substantially similar facts. If the state court's decision is not contrary to law, the reviewing court must then determine whether the state court unreasonably applied the relevant Supreme Court authority. The state court decision must stand unless it is not debatable among reasonable jurists that the result of which petitioner complains is incorrect."), *cert. denied*, 525 U.S. 1075, 119 S.Ct. 811, 142 L.Ed.2d 671 (1999); *see Bottoson, supra*, 234 F.3d at 531 (11th Cir. 2000) ("In addition, a state court decision involves an unreasonable application of Supreme Court precedent 'if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'").

12.     Recently, the Eleventh Circuit has restated those instances when state courts will be determined to have unreasonably applied precedent of the Supreme Court:

> A state court conducts an "unreasonable application" of clearly established federal law if it identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case. An unreasonable application may also occur if a state court unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court law to a new context. Notably, an "unreasonable application" is an "objectively unreasonable" application.

*Putman, supra*, 268 F.3d at 1241 (internal citations omitted). "[I]n the habeas context, clearly established federal law 'refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state court decision.'" *Id*. (citation omitted).

13.     In this case, Alabama's state trial court and intermediate appellate court, in separate decisions, reached the merits of petitioner's ineffective assistance of trial and appellate counsel claims.   The undersigned notes generally that though petitioner has established that the Alabama courts did not recognize all of the correct governing principles from the Supreme Court's decisions, specifically the prejudice prong of the ineffective assistance of counsel test, it did correctly recognize the governing principle regarding the deficiency prong of the ineffective assistance of counsel standard and, in this

regard, the state court decisions' are neither "contrary to" Supreme Court precedent nor did the Alabama courts unreasonably apply that specific principle to the facts in this case.

14.     Once a criminal defendant enters a guilty plea, he waives all non-jurisdictional challenges to the conviction's constitutionality and only an attack on the voluntary and knowing nature of the plea can be raised.  *See McMann v. Richardson*, 397 U.S. 759, 772, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970). Stated differently, "a voluntary and intelligent plea made by an accused person, who has been advised by ***competent counsel***, may not be collaterally attacked." *Mabry v. Johnson*, 467 U.S. 504, 508, 104 S.Ct. 2543, 2546-2547, 81 L.Ed.2d 437 (1984) (emphasis supplied).

15.     "In order for a guilty plea to be entered knowingly and intelligently, the defendant must have not only the mental competence to understand and appreciate the nature and consequences of his plea but he also must be reasonably informed of the charges against him, the factual basis underlying those charges, and the legal options and alternatives that are available."   *LoConte v. Dugger*, 847 F.2d 745, 751 (11th Cir.) (citations omitted), *cert. denied*, 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988); *see also Stano v. Dugger*, 921 F.2d 1125, 1141 (11th Cir.) ("A reviewing

federal court may set aside a state court guilty plea only for failure to satisfy due process: If a defendant understands the charges against him, understands the consequences of a guilty plea, and voluntarily chooses to plead guilty, without being coerced, the guilty plea . . . will be upheld on federal review."), *cert. denied sub nom. Stano v. Singletary*, 502 U.S. 835, 112 S.Ct. 116, 116 L.Ed.2d 85 (1991), *remanded on other grounds*, 952 F.2d 1273 (11th Cir. 1992).

16.     The defendant must have full knowledge of the consequences of entering a plea of guilty to the charge to withstand challenge under the Due Process Clause, *see Mabry, supra*, 467 U.S. at 509, 104 S.Ct. at 2547, as a plea of guilty is a waiver of several constitutional rights, including the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment and the right to insist on a jury trial and to confront one's accusers guaranteed by the Sixth Amendment, *Boykin v. Alabama*, 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969).   "*Boykin* stands for the proposition that a defendant is constitutionally entitled to have information concerning the range of punishment prescribed by act to which he may be sentenced and the consequences of the conviction at the time he enters his plea."   *Coleman v. Alabama*, 827 F.2d 1469, 1473 (11th Cir. 1987).

17.     In order to establish a claim of ineffective assistance of counsel,

petitioner is required to show (1) that his attorney's representation fell below "an objective standard of reasonableness" and (2) that a reasonable probability exists that but for counsel's unprofessional conduct, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The *Strickland v. Washington* standard for evaluating claims of ineffective assistance of counsel was held applicable to guilty pleas in *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985).

> To succeed on such a claim, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).[24] In addition, the defendant must establish that "counsel's constitutionally ineffective performance affected the outcome of the plea process." *Hill*, 474 U.S. at 59, 106 S.Ct. at 370. In other words, . . . [a petitioner] "must show that there is a reasonable probability that, but for counsel's errors, he would . . . have pleaded [not] guilty and would . . . have insisted on going to trial." *Hill*, 474 U.S. at 59, 106 S.Ct. at 370.

*Coulter v. Herring*, 60 F.3d 1499, 1504 (11th Cir. 1995) (footnote, brackets and ellipses added), *cert. denied sub nom. Coulter v. Jones*, 516 U.S. 1122,

---

[24] "When analyzing ineffective-assistance claims, reviewing courts must indulge a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance." *Smith v. Singletary*, 170 F.3d 1051, 1053 (11th Cir. 1999) (citations omitted).

116 S.Ct. 934, 133 L.Ed.2d 860 (1996).

18. Here, the state courts correctly identified *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) as controlling legal authority, but failed to recognize that *Hill v. Lockhart, supra*, made *Strickland* applicable to guilty plea proceedings. *Strickland* and *Hill* are identical regarding the first prong or deficiency prong of the legal standard but the analysis is slightly different regarding the prejudice prong; therefore, the State courts' analysis cannot be found to be "contrary to" controlling Supreme Court precedent to the extent the analysis rises and falls on the first prong of *Strickland* and *Hill*, *see Williams v. Taylor, supra,* 529 U.S. at 405 & 406, 120 S.Ct. at 1519 & 1520 ("The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.' . . . [A] run-of-the-mill state-court decision applying the correct legal rule from our cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court

considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as 'diametrically different' from, 'opposite in character or nature' from, or 'mutually opposed' to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not 'mutually opposed' to *Strickland* itself."); *Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002) ("A state court's decision that applies the correct legal rule would not fit within the 'contrary to' clause even if the federal court might have reached a different result relying on the same law. . . . In this case, the state court, by correctly identifying *Strickland* as the controlling legal authority on claims of ineffective assistance of counsel, did not reach an opposite conclusion from the Supreme Court on a question of law."), but is technically "contrary to" Supreme Court precedent to the extent the state courts' analyses rises and falls on the prejudice prong of *Strickland* since the proper prejudice analysis is set forth in *Hill*. Under the "unreasonable application" clause, petitioner has not and cannot establish that the Alabama courts unreasonably applied the "deficiency" principle to the facts in this case, *Williams v. Taylor, supra*, 529 U.S. at 411, 120 S.Ct. at 1522 ("Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may

not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."); *see also Woodford v. Visciotti*, 537 U.S. 19, 25, 123 S.Ct. 357, 360, 154 L.Ed.2d 279 (2002) ("[I]t is the habeas applicant's burden to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. An '*unreasonable* application of federal law is different from an *incorrect* application of federal law.'"), but has, again, technically established that the "prejudice" prong was unreasonably applied to the facts of this case. Moreover, the decision of the Alabama Court of Criminal Appeals is quite cursory and, therefore, this Court looks at each specific instance of ineffective assistance of trial and appellate counsel alleged and considers whether any of those claims have merit.

19.     Weed contends in the present petition, as he contended in the state courts, that trial counsel committed the following errors: (1) he failed to reserve the right to appeal the recusal issue; (2) he waived petitioner's right to a bifurcated trial on the competency issue and to petitioner's presence at the recusal hearing; (3) he did not sufficiently confer with petitioner prior to trial because he at no time met with petitioner to discuss the case when an interpreter was present; (4) he allowed petitioner to plead guilty to a sexual offense even

89

though the DNA evidence indicated petitioner could not have committed the crime; (5) he did not object to or reserve for appeal petitioner's right to have his criminal prosecutions assigned to a judge by the usual lottery system; (6) he failed to confer with petitioner at a location away from the courthouse and did not reserve this issue on appeal; (7) he failed to request the services of interpreters in a timely manner; and (8) he did not challenge the constitutionality of Alabama law regarding the appointment of interpreters for deaf mutes in criminal prosecutions and/or its failure to satisfy constitutional standards.

20.     White explained during his Rule 32 hearing testimony that he did not reserve the recusal issue for appeal because he failed to perceive any reason to take this course of action in light of Weed's decision to plead guilty to two of the charges lodged against him. In light of this testimony, and recognizing that this Court must indulge a strong presumption that counsel's conduct falls within a wide range of reasonably professional assistance, the undersigned cannot find trial counsel deficient for failing to reserve the recusal issue for appeal. Moreover, petitioner has made no showing whatsoever that had this issue been reserved for appeal that he would have pled not guilty and insisted on going to trial.  It is clear to the undersigned that it very much behooved Weed to plead guilty to two of the charges and be sentenced to ***concurrent*** life sentences as

90

opposed to risking a trial on all three charges and, upon conviction, facing the distinct possibility of three *consecutive* life sentences, regardless of the identity of the presiding judge, given the heinous nature of the facts in this case.

21.     Petitioner has not established that trial counsel was deficient in waiving his right to a bifurcated trial on the competency issue and to his presence at the recusal hearing. These actions of trial counsel were, in the undersigned's opinion, unassailable strategic decisions. White testified at the Rule 32 hearing that he waived Weed's presence at the recusal hearing because of petitioner's past penchant for outbursts in court; counsel explained that he felt his only chance for convincing the trial judge to recuse himself was to make those arguments outside Weed's presence.   When this testimony is combined with the fact that the court only entertained oral argument on the recusal issue, and no testimony from any witness, the undersigned cannot find that trial counsel was deficient in waiving Weed's presence at the recusal hearing. White also testified at the Rule 32 hearing that he waived Weed's right to a bifurcated trial on the competency issue upon reading the psychological reports and interpreting the results to establish his client's competency to stand trial and receiving an oral communication from Dr. James F. Chudy that he was not going to be able to be of assistance on the competency issue. Based upon the

91

foregoing, it is the undersigned's opinion that White was not deficient in waiving a bifurcated trial on the competency issue; the undersigned too has read the psychological reports and finds that trial counsel correctly concluded that those reports were not going to establish petitioner's incompetency to stand trial.

22.    Petitioner next contends that trial counsel did not sufficiently confer with him prior to trial inasmuch as at no time did counsel meet with him to discuss the case when an interpreter was present. It is clear from trial counsel's Rule 32 hearing testimony that he successfully communicated with Weed prior to trial through written notes and through petitioner's mother, who relayed messages back and forth between counsel and petitioner, who was incarcerated in the county jail. Inasmuch as the record makes clear that petitioner is capable of communicating not only through sign language but also through written language, this Court cannot find that White was deficient in communicating with Weed through written notes when he visited him in jail prior to his trial.

23.    Weed's allegation that his trial attorney was ineffective for allowing him to plead guilty to a sexual offense even though the DNA evidence indicated that he could not have committed the crime is wholly specious. The fact that Weed's DNA was not found on the oral swabs does not establish that petitioner did not sodomize Ms. Snow inasmuch as, under Alabama law, a

victim's testimony alone that a defendant by forcible compulsion placed his penis in her mouth is sufficient to support a guilty verdict for first-degree sodomy, and in this case the victim was prepared to give exactly that testimony. The presence of Weed's semen on a piece of cardboard in the room where Ms. Snow was prepared to testify that she was sodomized by petitioner would have simply been the crowning blow for the prosecution. It is clear from the evidence, therefore, that White was not deficient in allowing Weed to plead guilty to first-degree sodomy.

24.    Weed next contends that trial counsel was deficient in failing to object to and reserve for appeal his right to have his criminal prosecutions assigned to a judge by the usual lottery system. This claim is also specious inasmuch as the record reveals that Weed's criminal prosecutions were initially assigned to a judge via the ususal lottery system and that at some point in time after that assignment took place, Judge Joseph Johnston went to the lottery-assigned judge (or actually the judge who inherited the case from the retired, lottery-assigned judge) and had the case transferred to his docket. The action of Judge Johnston in requesting reassignment formed the basis of the motion to recuse. Because Weed's criminal cases were initially assigned to a judge by the usual lottery system, White had no basis to assert the contrary; therefore, trial counsel was obviously not deficient in this regard.

25.     Petitioner's contention that trial counsel failed to confer with him at a location away from the courthouse, and failed to reserve this issue for appeal, is also specious. White's Rule 32 hearing testimony unequivocally establishes that he conferred with Weed at the county jail on several occasions prior to trial. Because the record establishes that trial counsel conferred with Weed at a location away from the courthouse, specifically the county jail, trial counsel had no issue to reserve for appeal. Petitioner has failed to establish trial counsel's deficient performance in this regard.

26.     Petitioner contends that trial counsel was deficient in failing to request the services of interpreters in a timely manner. The problem with this argument is that timeliness was not the issue. The trial court granted the request for services of interpreters the Friday before trial was to start on Monday. Because petitioner has not shown and cannot show that White or any reasonable attorney would have appreciated or should have anticipated that one interpreter would balk at appearing in court because not enough interpreters were going to show up for the trial or that the interpreter for the defense would voice an ethical problem with interpreting for Weed any question or argument made by the State, White was not deficient in any aspect of the way he handled the request for the services of interpreters.

27.     Petitioner's final argument is that trial counsel was deficient in

94

failing to challenge the constitutionality of Alabama law regarding the appointment of interpreters for deaf mutes in criminal prosecutions and for its failure to satisfy constitutional standards. This argument is the height of Monday-morning quarterbacking and this Court will not find White deficient for failing to make such a challenge to Alabama law particularly when it is clear to the undersigned that Weed's case could have been successfully tried to a jury had the one additional interpreter shown up on the morning of trial, along with the defense interpreter, and there having been no showing by petitioner that any federal court, sitting on habeas review, has determined that deaf mute defendants are entitled to at least three interpreters during the course of their criminal prosecutions.

28.    Weed also contends that appellate counsel was deficient in the following respects: (1) he failed to raise trial counsel's effectiveness on appeal; (2) he failed to raise the *Brady* violation on appeal; (3) he failed to raise on appeal the issue of a due process and equal protection violation; (4) he failed to raise the issue regarding petitioner's right to assist in his defense, his right to know the evidence, his right to evaluate the evidence as a result of being denied sufficient funds to hire interpreters, and the withholding of exculpatory evidence; and 5) he failed to raise on appeal the issue of the unconstitutionality of Alabama law regarding the appointment of interpreters to deaf mutes in

criminal prosecution and/or its failure to satisfy constitutional standards. Inasmuch as this Court has specifically determined that trial counsel did not provide ineffective assistance of counsel, appellate counsel obviously was not deficient for failing to challenge trial counsel's effectiveness on appeal nor was appellate counsel deficient for challenging Alabama law regarding the appointment of interpreters.

29.    Petitioner's contention that appellate counsel was deficient in failing to raise "the *Brady* violation" on appeal is specious since there was no *Brady* violation in this case. As previously determined, petitioner's trial counsel was given the forensic test results in this case well in advance of trial and those results simply did not and do not exculpate Weed of the first-degree sodomy of Ms. Snow nor would they impeach the victim's anticipated trial testimony. Accordingly, appellate counsel was not deficient for failing to raise this non-issue on appeal.

30.    The foregoing "*Brady* conclusion" also informs this Court's discussion of petitioner's claim that appellate counsel was deficient in failing to raise the issue of petitioner's right to assist in his defense, his right to know the evidence and his right to evaluate the evidence as a result of being denied sufficient funds to have interpreters and the withholding of exculpatory evidence. As aforesaid, the State did not withhold exculpatory evidence. The

96

petitioner, through his attorney, was well aware of the evidence against him and a defense interpreter was in court on the day Weed's trial began to assist him in evaluating that evidence.[25] Finally, Weed was not denied sufficient funds to hire interpreters. In fact, it is clear that the trial court would have authorized funds for two interpreters to handle petitioner's trial and because Weed has not shown that a deaf mute has a constitutional right to have at least three interpreters at his trial,[26] petitioner has no argument in this regard. Accordingly, appellate counsel was not deficient in failing to raise this convoluted and confusing "issue" on appeal.

31.    Petitioner's final argument is that appellate counsel was deficient in failing to raise on appeal the issue of a due process and equal protection violation as a result of the trial court's failure to grant him sufficient funds for interpreters. Of course, as just determined, the trial court did not fail to grant Weed sufficient funds for interpreters. Moreover, Weed entered counseled guilty pleas to the charges of first-degree robbery and first-degree sodomy and

---

[25]    In addition, petitioner clearly had the opportunity to evaluate the evidence with his attorney through written notes.

[26]    *Cf. Phillips v. Miller*, 2000 WL 33650803, *9 (S.D.N.Y. 2000) ("[T]he Supreme Court 'has yet to recognize the right to a court-appointed interpreter as a constitutional one.' . . . Rather, the Supreme Court has stated that the decision of whether or not to appoint an interpreter 'is a matter largely resting in the discretion of the trial court.'")).

there has never been any argument that the one interpreter used for the guilty plea proceeding was insufficient. Therefore, appellate counsel did not have a viable due process and equal protection violation to raise on appeal.[27]

## **CONCLUSION**

The Magistrate Judge is of the opinion that petitioner's rights were not violated in this cause and that his request for habeas corpus relief should be denied.

The attached sheet contains important information regarding objections to the report and recommendation of the Magistrate Judge.

**DONE** this the 27th day of July, 2005.

s/WILLIAM E. CASSADY
**UNITED STATES MAGISTRATE JUDGE**

---

[27]      The only way this issue could possibly have been viable was for petitioner to have insisted on a trial and for there to have been insurmountable problems encountered at trial because only one interpreter would show up for the proceedings.

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND
RESPONSIBILITIES FOLLOWING RECOMMENDATION, AND
FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.      *Objection*.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the Clerk of this court.  Failure to  do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the Magistrate Judge.  *See* 28 U.S.C. § 636(b)(1)(C); *Lewis v. Smith*, 855 F.2d 736, 738 (11th Cir. 1988); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. Unit B, 1982)(*en banc*).  The procedure for challenging the findings and recommendations of the Magistrate Judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a 'Statement of Objection to Magistrate Judge's Recommendation' within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

> A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      *Transcript (applicable Where Proceedings Tape Recorded)*.  Pursuant to 28 U.S.C. § 1915 and FED.R.CIV.P. 72(b), the Magistrate Judge finds that the tapes and original records in this case are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.

s/WILLIAM E. CASSADY                        
UNITED STATES MAGISTRATE JUDGE

99